**RALSTON PURINA COMPANY,**
Appellee,

v.

**William A. McFARLAND, Appellant.**

**No. 75–2022.**

United States Court of Appeals,
Fourth Circuit.

Argued May 5, 1976.

Decided Feb. 23, 1977.

Ronald H. Ruis, Durham, N.C. (Harriss, Ruis & Mulligan, Durham, N.C., on brief), for appellant.

Robert L. Emanuel, Raleigh, N.C. (Emanuel & Thompson, Raleigh, N.C., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, CRAVEN, Circuit Judge, and FIELD, Senior Circuit Judge.

FIELD, Senior Circuit Judge:

This diversity action was instituted by the plaintiff, Ralston Purina Company (Purina), to recover damages from William A. McFarland based upon his breach of a contract to sell and deliver to the plaintiff at its plant in Raleigh, North Carolina, a quantity of soybeans from his 1973 crop. The district court granted summary judgment in favor of Purina on the breach of contract issue and thereafter submitted the issue of damages to a jury. Judgment was entered upon the jury's verdict in favor of Purina in the amount of $100,247.00, and McFarland has appealed.

The undisputed facts are as follows. In the summer of 1972 the parties entered into two "Confirmation of Purchase" agreements (Nos. 106 and 384) under which McFarland agreed to sell to Purina a total of forty thousand bushels of his 1972 soybean crop. Each of the purchase agreements called for twenty thousand bushels to be delivered in October, November or December of that year at a price of $3.11½ and $3.29¼ per bushel, respectively. McFarland made a partial delivery on December 7, 1972, but on the following day notified Purina that severe weather had rendered a substantial part of his crop unharvestable and he would be unable to deliver 30,412 bushels upon his contractual commitments. By letter of December 11, 1972, Purina advised McFarland that in accordance with Rule 10 of the Trade Rules of the National Grain and Feed Association[1] it had purchased 30,412 bushels of soybeans, and demanded payment in the amount of $27,-326.51 for the loss resulting from McFarland's default. Thereafter, the parties dis-

---

1. Rule 10 reads in pertinent part as follows:
   "Rule 10. *Incomplete Shipment*:
   SELLERS CONVEYANCE: When the seller finds that he will not be able to complete a contract within the agreed limit, it shall be his duty at once to advise the buyer by telephone or telegraph, whereupon it shall be the duty of the buyer at once to elect either to (a) agree with the seller upon an extension of the contract, (b) after having given 24 hours notice to the seller to complete the contract, the buyer will buy-in the defaulted portion of the contract within the next business day, (c) after having given 24 hours notice to the seller to complete the contract, the buyer will cancel the defaulted portion of the contract within the next business day. * * * *".

cussed a possible settlement, but were unable to agree whether the loss should be computed on the basis of the difference between the stated contract price and the Raleigh market price or the Chicago market price, Purina contending that the latter was appropriate. As a result of this impasse Purina declined to pay for the beans already delivered and McFarland suspended further shipments.

Early in the year of 1973 settlement negotiations were renewed and as a result thereof, on February 19, 1973, McFarland entered into another Confirmation of Purchase (No. 101). This agreement provided that he would sell to Purina 35,412 bushels of soybeans (the undelivered balance of contracts Nos. 106 and 384) at $3.20 per bushel, delivery to be made during the last three months of 1973. By letter of the same date, Purina advised McFarland that completion of delivery of the soybeans called for under contract No. 101 would fulfill all of his obligations for the shortage of delivery of the 35,412 bushels under contracts Nos. 106 and 384. The planting and harvesting of soybeans proceeded well in 1973 and in the fall of that year McFarland had on hand or in the field sufficient beans to fulfill the contract. However, on October 10, 1973, McFarland advised Purina that he would not deliver any soybeans to them. Purina confirmed this conversation by letter and stated that in accordance with Rule 13 of the Grain Association Trade Rules[2] it would buy in the 35,412 bushels. Later, on November 6, 1973, counsel for Purina, in a letter directed to McFarland's attorney, computed its loss on the contract at $2.99 per bushel and made a demand for payment in the total amount of $102,548.78.[3]

Upon this appeal McFarland presses three contentions: first, that the district court erred in granting Purina's motion for summary judgment upon the issue of liability; second, that the court failed to apply the proper measure of damages; and third, that the court abused its discretion in limiting McFarland's pretrial discovery.

■ In challenging the award of summary judgment to Purina, McFarland contends that subsequent to the execution of contract No. 101, he determined to his satisfaction that under the Grain Association Trade Rules contracts Nos. 106 and 384 should have been settled on the Raleigh market-contract basis and that he also discovered that Purina had settled on such terms with other farmers. These developments, McFarland argues, justified his refusal to make delivery to Purina under contract No. 101. McFarland makes no charge that Purina made any misrepresentation of fact in negotiating with him for the settlement of the 1972 contracts and, subject to the observations we will make later in this opinion about the possible impact of the UCC, upon the record before it the district court properly found that contract No. 101 represented an executory accord which could not be characterized as unconscionable. Under such circumstances, when the accord was repudiated by McFarland, Purina had the choice to sue on the original contracts or on the accord itself. *Dobias v. White,* 239 N.C. 409, 80 S.E.2d 23 (1954).

McFarland also urges that contract No. 101 was, in effect, an extension of Nos. 106 and 384 and that the rights of the parties must be determined by a consideration of these antecedent agreements. Assuming, *arguendo,* that McFarland's position on this point is correct, he would fare no better under such an approach. No. 101 reflected the undelivered quantities of soybeans under the two prior contracts and the price of

---

**2.** Rule 13. *Buying in* : Where the words "buy in" occur in these rules they shall mean an actual purchase of grain of like kind and quantity on the open market; provided, that when this is not feasible or would result in undue penalty to the seller, the buyer shall have the privilege of establishing a fair market value for the purpose of determining any loss properly chargeable to the seller.

**3.** In his deposition McFarland testified that he harvested approximately the volume of soybeans called for in his contract with Purina. The crop was stored for a short-time and thereafter sold by McFarland on the market for $212,570.62.

$3.20 per bushel was an intermediate blend of the prices stated in those contracts. When McFarland finally refused to perform in October of 1973, the measure of damages on such a default would have been substantially the same as that applied on the breach of No. 101. McFarland relies heavily upon *Ralston Purina Company v. McNabb*, 381 F.Supp. 181 (W.D.Tenn.1974), but we do not find it supportive of his position. In that case the bad faith which the jury attributed to Ralston Purina was its action in urging the seller "to accept an extension so that, in the face of a foreseeably rising market, it could maximize damages." *Id.*, at 183. McFarland levels no such charge against Purina in the present case, and it is clear from the record that it was McFarland who elected to repudiate the agreement and selected the time for doing so.

▪ Additionally, McFarland argues that summary disposition was inappropriate since Purina failed to give him the twenty-four hour notice contemplated by Rule 10 of the Grain Association Trade Rules. He stated in both his deposition and affidavit that he could not "hazard a guess" as to what position he might have taken had he received such a notice. The thrust of McFarland's argument on this point is somewhat obscure to us, but in any event it is without merit. Rule 10 applies only to a situation involving the inability of a seller to complete the contract and under such circumstances permits the buyer to buy in the defaulted portion after giving the twenty-four hour notice to the seller to complete

the contract. Since McFarland concedes that he had ample soybeans to make delivery under contract No. 101 but purposely elected not to do so because of his supposed grievance against Purina, Rule 10 obviously has no application to this case.

On the issue of the measure of damages, McFarland contends that since it was the policy of Purina to hedge its soybean purchase contracts, evidence of such practice and the cost of closing out the hedge incident to McFarland's default should have been placed before the jury. The plaintiff argues that such a hedge would constitute "cover" under sections 2–711[4] and 2–712[5] of the Uniform Commercial Code and in the present case would result in a substantial mitigation of damages. In our opinion the district court properly excluded such evidence for we fail to see any relation between the practice of hedging and "cover" under the Uniform Commercial Code.

"Hedging" is a means by which a party who deals in the purchase of commodities in large quantities for actual delivery at some future time insures itself against unfavorable changes in the price of such commodities by entering into compensatory arrangements or counterbalancing transactions on the other side. *United States v. New York Coffee and Sugar Exchange, Inc., et al.*, 263 U.S. 611, 44 S.Ct. 225, 68 L.Ed. 475 (1924); *Board of Trade of the City of Chicago v. Christie Grain and Stock Company*, 198 U.S. 236, 249, 25 S.Ct. 637, 49 L.Ed. 1031 (1905).

In the present case any hedging by Purina enabled it to pay McFarland a price set

---

4. Section 2–711 reads in part as follows:

> "Buyer's remedies in general; buyer's security interest in rejected goods.—
> (1) Where the seller fails to make delivery or repudiates * * * the buyer may * * * in addition to recovering so much of the price as has been paid
> (a) 'cover' and have damages under the next section as to all the goods affected whether or not they have been identified to the contract; or
> (b) recover damages for nondelivery as provided in this article (Section 2–713)."
> N.C.G.S. § 25-2-711

5. Section 2–712 provides:

> " 'Cover'; buyer's procurement of substitute goods.—
> (1) After a breach within the preceding section the buyer may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.
> (2) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (Section 2–715), but less expenses saved in consequence of the seller's breach."
> N.C.G.S. § 25-2-712.

at the time the contract was made and remain in substantially the same position as if it paid the cash market price at the time of performance. Any futures contract which Purina might have purchased to close out the hedge merely replaced the futures contract which Purina sold to effect the hedge at the time the contract with McFarland was made, and any difference in price between the two served to balance the contract price with McFarland and the market price at the time of performance. In closing out the hedge Purina did not "cover" the deficiency in soybeans resulting from the failure of McFarland to perform. To cover that deficiency it would be necessary for Purina, in addition to closing out the hedge, to make an actual purchase of the soybeans to replace those which McFarland should have delivered.

With respect to "cover", the Uniform Commercial Code provides that in the event of a breach a "buyer may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller," [6] and in such event he may recover as damages the difference between the cost of the cover and the contract price. Since there was no evidence of "cover" in the present case, the district court properly submitted the issue of damages to the jury under section 2–713 of the Uniform Commercial Code which provides that the measure "is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages * * *, but less expenses saved in consequence of the seller's breach." [7] There was ample evi-

dence to support the jury's finding on the prevailing market price in the Raleigh area on October 10, 1973, and the evidence further indicated that on that date the bid price on soybeans was the same for immediate delivery as it was for beans to be delivered in October, November and December of that year. While the defendant complains that he should have been permitted to present evidence of expenses saved by Purina in consequence of his breach, the district court properly excluded such evidence since Purina relied solely upon the measure of market price and did not attempt to collect any incidental or consequential damages.

The most troublesome question on this appeal is McFarland's claim that he was unduly restricted in his pretrial discovery efforts. Under the local rules of the district court the parties are required to complete their discovery within four months after a case is at issue, but this period may be extended by the court upon a showing of good cause.[8] In the present case the discovery period expired on August 26, 1974, and while the plaintiff had deposed McFarland, the defendant had not initiated any discovery within the prescribed period. The court granted the defendant an additional forty-eight days for discovery and toward the end of that period the defendant took the deposition of John W. Wagnon, Jr., the principal witness for the plaintiff.

McFarland's counsel undertook to examine Mr. Wagnon in an effort to discover information that might lead to relevant evidence pertaining to McFarland's defense. Rightly or wrongly, McFarland contended that he was prevented from delivering soybeans under contracts 106 and 384 because

6. Section 2–712, n.5, supra.

7. Section 2–713 reads in its entirety as follows:
    "*Buyer's Damages for Non-Delivery or Repudiation.*—
    (1) Subject to the provisions of this Article with respect to proof of market price (§ 25–2–723), the measure of damages for non-delivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and contract price together with any incidental

and consequential damages provided in this article (§ 25–2–715), but less expenses saved in consequence of the seller's breach.
    (2) Market price is to be determined as of the place for tender or, in cases of rejection after arrival or revocation of acceptance, as of the place of arrival." N.C.G.S. § 25–2–713.

8. Rule 7, Local Rules, United States District Court for the Eastern District of North Carolina.

of crop failure amounting to an act of God, and that Purina had established a practice in the trade of settling such unperformed contracts on the Raleigh price for soybeans but had insisted that McFarland pay the higher Chicago price, and that such conduct by Purina, although not fraudulent, violated the duty of good faith established by Section 1–203 of the UCC. McFarland's theory embraces Section 1–205 of UCC, which section provides that an applicable usage of trade in the place where any part of performance is to occur shall be used in interpreting the agreement as to that part of the performance. Thus, it was McFarland's purpose to attempt to elicit from Mr. Wagnon information to support a pattern or usage which would raise a question of fact for the jury as to whether such a dominant pattern is incorporated into the contract. Additionally, as heretofore stated, McFarland contended that new contract 101 amounted to simply a one-year extension of the time of performance of old contracts 106 and 384 and, thus, conversations and oral agreements about performance of contracts 106 and 384 were relevant and admissible under the more liberal parol evidence rule incorporated into Section 2–202 of UCC. *See Ralston Purina Co. v. McNabb, supra.* On this question, counsel for Purina permitted Mr. Wagnon to partially answer, and what he said seems supportive of the McFarland theory.[9] But when McFarland's counsel propounded questions to Mr. Wagnon "pertaining to the performance of confirmations of purchases 106 and 384," counsel for Purina effectively stopped the examination.[10]

---

**9.** WAGNON: This was—this contract 101 replaced those two contracts.

Q. It replaced it?
A. Well, maybe that's poor terminology. This in essence was a—granted him the privilege of delivering in the fall of '73.
Q. For delivery due in the fall of '72?
A. For beans which he—for contracts which he did not fulfill in the fall of '72.
Q. Which were due in the fall of '72?
A. That's correct.
Q. Allowing him then to deliver in the fall of '73 for beans due in the fall of '72?
A. That is correct.
APPENDIX at 21–22.

**10.** The following excerpt from the record is illustrative:

Q: (Mr. Ruis) Did you ever ascertain that there was, in Durham County, did you ever ascertain any sort of problems with the 1972 soybean crop?
MR. EMANUEL: Objection, and instruct the witness not to answer.
EXAMINATION BY MR. HARRISS:
Q: Do you have knowledge regarding heavy precipitation in the late fall of 1972 which made the harvesting of soybeans in Durham County exceedingly difficult and if not impossible?
MR. EMANUEL: Objection, and instruct the witness not to answer.
Q: (Mr. Harriss) Was it reported to you that weather conditions made it difficult to harvest crops in Durham County in the months of October and November and December of 1972?
MR. EMANUEL: Objection, and instruct the witness not to answer.
Q: (Mr. Harriss) Did you make any reports to your superiors in the Ralston Purina Company regarding weather conditions in Durham County in October, November, and December of 1972, that made the harvesting of soybeans difficult or impossible?
MR. EMANUEL: Object and instruct the witness not to answer.
Q: (Mr. Harriss) Were there any general procedures established by Ralston Purina for the handling of crop problems involving soybeans in the Raleigh-Durham area arising during the months of October, November, and December of 1972?
MR. EMANUEL: Objection, and instruct the witness not to answer.
Q: (Mr. Ruis) Did you have specific knowledge of any problem Mr. William A. McFarland of Durham County had with his crop in October, November and December of 1972?
MR. EMANUEL: Objection, and instruct the witness not to answer.
Q: Do you recall making a telephone conversation with Mr. William McFarland on or about December the 7th, 1972?
MR. EMANUEL: Objection.
Q: (Mr. Ruis) Have you any memorandum of that conversation?
MR. EMANUEL: Objection.
MR. HARRISS: He's not ordering him not to answer.
MR. EMANUEL: Well, I do, I will. I do.
MR. HARRISS: The last two questions:
MR. EMANUEL: Yes.
Q: (Mr. Ruis) Do you recall a visit by Mr. William McFarland to your facility in Raleigh on December the 8th, 1972?
A: Yes. December the 8th?
Q: 1972?
A: Yes.
Q: What transpired to your recollection?
MR. EMANUEL: Objection.

As a consequence, the defendant filed a motion with the court for an order directing Wagnon to answer the questions and to extend the time for discovery. The motion was not acted upon prior to the hearing on the plaintiff's motion for summary judgment, and in its order on the latter motion, the court, in a footnote, denied both of the discovery motions. After the entry of summary judgment, however, the court granted that part of the defendant's motion which sought documents and information bearing upon the issue of damages and the court's action provided the defendant ample time and opportunity to develop this information prior to the jury trial on the damage issue. Since we cannot guess what answers might have been elicited from Mr. Wagnon but for counsel's thwarting of the purpose of the deposition, we must assume that his answers would have been beneficial and, if not themselves constituting relevant evidence, might have led to the procuring of such evidence.

■ The action of plaintiff's counsel in directing Wagnon not to answer the questions posed to him was indefensible and utterly at variance with the discovery provisions of the Federal Rules of Civil Procedure. The broad scope of discovery is evident in Rule 26(b)(1) which provides that "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action". The Rule further states that "[i]t is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." The underlying philosophy of the discovery rules was stated by the Court in the landmark case of *Hickman v. Taylor,* 329 U.S. 495 (1947) at 507, 67 S.Ct. 385, at 392, 91 L.Ed. 451:

We agree, of course, that the deposition-discovery rules are to be accorded a broad and liberal treatment. No longer can the time-honored cry of "fishing expedition" serve to preclude a party from inquiring into the facts underlying his opponent's case. Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel the other to disgorge whatever facts he has in his possession. (Footnote omitted.)

The questions put to Wagnon were germane to the subject matter of the pending action and therefore properly within the scope of discovery. They should have been answered and, in any event, the action of plaintiff's counsel in directing the deponent not to answer was highly improper. The Rule itself says "Evidence objected to shall be taken subject to the objections", and Professor Wright says it means what it says, citing *Shapiro v. Freeman,* D.C.N.Y. 1965, 38 F.R.D. 308, for the doctrine: "Counsel for party had no right to impose silence or instruct witnesses not to answer and if he believed questions to be without scope of orders he should have done nothing more than state his objections." Wright & Miller, Federal Practice and Procedure: Civil § 2113 at 419, n.22 (1970). We agree. If plaintiff's counsel had any objection to the questions, under Rule 30(c) he should have placed it on the record and the evidence would have been taken subject to such objection. If counsel felt that the discovery procedures were being conducted in bad faith or abused in any manner, the appropriate action was to present the mat-

Q: (Mr. Ruis) Did you meet with Mr. McFarland on that day?
    MR. RUIS: He hasn't instructed you not to answer.
    MR. EMANUEL: I instruct you not to answer.
Q: (Mr. Ruis) Do you recall, did you see Mr. McFarland on that day, December the 8th, 1972?

A: Yes.
Q: Did you speak with him?
A: Yes.
Q: After you spoke with him did you make any memorandum of your conversation?
    MR. EMANUEL: I object and instruct him not to answer.
APPENDIX at 46–48.

ter to the court by motion under Rule 30(d).[11]

On remand, the district court will vacate its judgment, grant to McFarland an opportunity to pursue interrogation of Mr. Wagnon that was previously frustrated by Purina, and thereafter consider whether or not to grant McFarland a new trial. If the court should conclude that Mr. Wagnon's completed testimony has not led to relevant evidence and is itself insufficient to create a question of fact for the jury in light of the good faith duty imposed by UCC, the court may then reinstate its entry of summary judgment and reinstate the jury verdict on the question of damages. If a fact question is created by the testimony or information to which counsel is led by Mr. Wagnon's testimony, the court will then, of course, grant a new trial.

VACATED AND REMANDED WITH INSTRUCTIONS.

11. Rule 30(d) provides in part as follows:

*Motion to Terminate or Limit Examination.* At any time during the taking of the deposition, on motion of a party or of the deponent and upon a showing that the examination is being conducted in bad faith or in such manner as unreasonably to annoy, embarrass, or oppress the deponent or party, the court in which the action is pending or the court in the district where the deposition is being taken may order the officer conducting the examination to cease forthwith from taking the deposition, or may limit the scope and manner of the taking of the deposition as provided in Rule 26(c).