**Richard CHIRA, Plaintiff,**

v.

**LOCKHEED AIRCRAFT CORP.,
Defendant.**

No. 78 Civ. 3829.

United States District Court,
S. D. New York.

Jan. 3, 1980.

Martin Paul Solomon, New York City, for plaintiff.

Rogers & Wells, New York City, for defendant; William F. Koegel, Rex W. Mixon, Jr., New York City, of counsel.

## MEMORANDUM AND ORDER

WHITMAN KNAPP, District Judge.

Before us is a motion to dismiss an action for failure to prosecute pursuant to Rule 41(b) of the Federal Rules of Civil Procedure. For reasons set forth in this opinion, the motion is granted.

### Facts

Plaintiff is an attorney admitted to the Bars of New York, California, the District of Columbia, and the United States Supreme Court. During the first sixteen years following his graduation from the New York University Law School in 1958, he was engaged in a variety of legal activities in different parts of the world: He participated in non-degree postgraduate programs in international and comparative law at universities in Copenhagen, Luxembourg, and Paris; was associated with various prominent law firms in New York, Par-

is, and Stockholm; was a legal adviser in the International Affairs Division of the United States Department of the Treasury in Washington, D. C.; was Associate Division Counsel of General Electric Co. in New York; and was a special legal adviser to a Cabinet Minister of the Imperial Iranian Government in Teheran.

In May of 1974, Lockheed Missiles & Space Company, Inc., a subsidiary of defendant Lockheed Aircraft Corp.[1] ("Lockheed"), published a job advertisement in *The Wall Street Journal*. In response to that advertisement, plaintiff, who was then located in New York, submitted a resume accompanied by a letter dated May 30, 1974, in which he asserted that "[f]or some time now, I have been especially interested in relocating on the West Coast given a suitable professional opportunity with a corporation in California." This resume subsequently came to the attention of defendant's Lockheed-California Company division, which contacted plaintiff and, following several telephone conversations, invited him to an interview at its Burbank, California offices. Plaintiff now alleges that in the course of these negotiations, it was "stated and implied" by defendant's agents that if he were to be employed by Lockheed-California, it would be "on a senior level in the legal department through which he would interface [*sic*] with senior management of defendant"; the scope of his duties and responsibilities would be commensurate with his "unique and varied corporate and international experience" and defendant "would help foster and develop his international expertise"; he would be included in any incentive compensation plan for executives when and if such a plan would be reinstated by defendant; and his position "would be a career and permanent position."[2] In September of 1974, Lockheed-California offered him a position as an attorney at a salary of $567.30 per week. Plaintiff accepted this offer and began work in Burbank on October 14.

In his complaint, plaintiff asserts that throughout the approximately thirty-three months that he was employed by Lockheed-California, defendant's executives led him to believe that they considered his work to be "more than satisfactory." For example, he claims that John Martin, defendant's chief counsel, with the encouragement of John Cavanagh, its general counsel and vice-president, nominated plaintiff to be general counsel of the Lockheed Petroleum Services Company in Canada, and that Martin also nominated plaintiff to the Geneva, Switzerland based position of European Counsel.

Plaintiff's complaint further asserts that the representations made to him by Lockheed's agents before he was hired were in fact false and fraudulent. He alleges that: "The scope and quantity of the international legal work, travel and negotiations assigned to him was appreciably less than had been represented"; he "was specifically excluded from certain major international legal negotiations involving his division without justification"; he was not treated as a senior legal executive commensurate with his experience; he was not introduced to the president of Lockheed, or to the president or other senior executives of the Lockheed-California Company; he was excluded from the executive dining room; he was "insulated from senior management so that he could not directly interface [*sic*], interact, or share his professional thinking with them"; on "one or more occasions" his name was excised from his own work product; and he was not allowed to join or receive the benefits of Lockheed's incentive compensation plan after the plan's reinstatement, which reinstatement was not disclosed to him.

Nevertheless, in the face of these alleged indignities, plaintiff continued in the em-

---

1.  Defendant's name is now Lockheed Corporation.

2.  In his complaint plaintiff asserts that "[t]he custom and practice of large American corporations with regard to professional employees

is that after a probationary period of from six months to one year, a professional employee is deemed permanent not subject to termination at will."

ploy of Lockheed-California until July of 1977. He claims that in the course of this employment, he developed certain physical symptoms which required medical attention. He claims that in early June 1977, after having been examined by one Phillip L. Miller, M.D., a North Hollywood, California physician, he requested a medical leave of absence from Thomas Kubani, his immediate supervisor, in order to undergo medical tests, consultations, and treatment in New York where his family resided. According to plaintiff's complaint, "Kubani wished him well." Plaintiff also claims that at about the same time, Dr. Miller wrote to Mr. Kubani as well as to John Cavanagh, Lockheed's general counsel, regarding plaintiff's medical condition and recommended that plaintiff be given at least six weeks medical leave of absence.

Defendant's version of the events of early July 1977 is somewhat different. At oral argument before us, defendant's counsel asserted that: During the thirty-three months of his employment with Lockheed-California, plaintiff had been absent for a great period of time; during the twelve months preceding July 1977, he had used up all his vacation time and had taken thirty-three business days of approved leave without pay; in July 1977 he requested additional time off to return East for what he said were personal business and family matters; his request was refused; and "he left, nevertheless, after getting a California doctor to say that he required some unspecified medical treatments."

In any case, it is undisputed that plaintiff did go to New York in the early part of July 1977. On July 19, Kubani, on behalf of defendant, sent a telegram to plaintiff addressed in care of the latter's brother in Rye, New York. This telegram contained the following language: "Our records indicate that you have been absent without authorization and salary since July 11. Unless you personally contact me by phone before end of business on July 21 I will consider you to have voluntarily terminated your employment." Plaintiff claims that because his brother had sublet his home in Rye, New York and was living in another State at that time, he did not receive a copy of the July 19 telegram until substantially after July 21.[3]

By telegram dated July 26, 1977, and addressed to a California address which supposedly was not plaintiff's official mailing address in that State, defendant advised plaintiff that: "Your failure to notify the company has resulted in your voluntarily terminating your employment." Plaintiff asserts that he received a copy of this telegram on August 1, and that he advised defendant by telegram and letter on that date that: He had not voluntarily terminated his employment at Lockheed; he had no wish to do so; he was still undergoing medical tests; and he expected to resume his duties at Lockheed immediately upon obtaining medical clearance. Apparently, however, plaintiff never did return to work at Lockheed. Nor is there any indication in the record before us that he ever attempted to do so. Plaintiff did, on August 23, 1977, and on November 14, 1977, apply for unemployment insurance benefits in California, which, according to defendant, he received in due course.

By summons and verified complaint dated, respectively, July 14 and July 18, 1978, plaintiff commenced an action against defendant in New York Supreme Court, New York County. In the twelve causes of action alleged in his complaint, plaintiff charges defendant, *inter alia*, with: Having made false and fraudulent representations;

3. There is no indication on the record before us how defendant obtained the Rye, New York address of plaintiff's brother, or what prompted it to send the July 19 telegram to that address. Plaintiff claims that at some point after the arrival of that telegram, plaintiff's brother's subtenant forwarded it to plaintiff's brother, and that the latter then telephoned Dr. Phillip Miller, the North Hollywood physician who had allegedly examined plaintiff before his departure from California. According to plaintiff, Dr. Miller in turn telephoned Dr. Charles Barron, defendant's in-house physician, who allegedly undertook to have the July 19 telegram retracted. We are not, however, advised precisely when any of these events are claimed to have occurred.

fraudulently "inducing plaintiff to terminate his association with one of the most established and prestigious international and corporate law firms in the United States"; tortiously interfering with plaintiff's career opportunities; breach of contract and wrongful discharge; defamation; causing irreparable injury to plaintiff's professional reputation as a result of the so-called "Lockheed scandal";[4] and intentional infliction of mental anguish, emotional distress, and physical illness. Plaintiff seeks an aggregate amount of $96,000,000 in actual and punitive damages.

On August 17, 1978, defendant removed the action to this Court pursuant to 28 U.S.C. § 1441(a), there being diversity and the matter in controversy exceeding $10,-000. Subsequently, on September 13, 1978, defendant moved pursuant to 28 U.S.C. § 1404(a) to transfer the action to the United States District Court for the Central District of California for its convenience and the convenience of witnesses. Defendant contended that all the relevant events underlying plaintiff's allegations occurred, if at all, in California, and that virtually all, if not all, potential witnesses were located in California. Defendant also brought to our attention that plaintiff had commenced a proceeding against it in California with the Fair Employment Practices Commission of the State of California which allegedly raised virtually all of the issues presented in the action before this court. In opposing defendant's motion to transfer, plaintiff claimed in an affidavit dated October 6, 1978, that "every" independent witness who was not an employee of defendant whom he was planning to call at trial, including six physicians identified by their last names only, resided in New York. Plaintiff did not, however, further identify these potential witnesses.

Even though it seemed to us that defendant's arguments were, in all likelihood, val-id, we found that the considerations advanced in support of defendant's motion did not, at that time, justify an order depriving plaintiff of his chosen forum. Consequently, by memorandum dated December 14, 1978, and filed December 20, we denied defendant's motion. However, in the same memorandum we ordered that plaintiff's discovery be completed within six months, at which time plaintiff was directed to file a statement showing exactly what he proposed to prove, what witnesses he planned to call, and giving a brief resume of the testimony expected from each witness. We further explicitly stated that upon receipt of such statement, defendant could, if it then seemed appropriate, renew its § 1404 motion to transfer.

Unbeknownst to us, on November 16, 1978, after argument before us of defendant's § 1404 motion but before our decision, plaintiff's attorney, Martin Paul Solomon, Esq., filed with the Los Angeles office of the United States Equal Employment Opportunity Commission a charge against defendant of employment discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*

For three months thereafter, plaintiff and his attorney, Mr. Solomon, apparently did nothing to even attempt to undertake discovery or to otherwise prosecute plaintiff's case. Defendant, meanwhile, served its request for the production of documents and noticed its deposition of plaintiff for March 21, 1979. On March 19, Mr. Solomon apparently advised defendant's counsel, the firm of Rogers & Wells, that plaintiff would not appear for his deposition on March 21 because he intended to make a motion to disqualify Rogers & Wells from continuing as defendant's counsel. On March 20, Mr. Solomon, on behalf of plaintiff, in fact made such a motion. Plaintiff claimed that it would be unethical and improper for Rogers & Wells to continue to

4. The so-called "Lockheed Scandal" arose out of the disclosures in 1975 and 1976 that Lockheed, its subsidiaries and affiliates had made $24,000,000 in allegedly illicit payments to foreign officials in efforts to secure foreign business. *See generally, e. g., Oversight on the* *Lockheed Loan Guarantee: Hearings Before The Senate Comm. On Banking, Housing and Urban Affairs,* 94th Cong., 2d Sess. (1976); Wall Street Journal, August 6, 1975, at 8, col. 1. *Cf. In re Letters Rogatory from Tokyo District, Tokyo, Japan* (9th Cir. 1976) 539 F.2d 1216.

represent defendant because: (1) While a law student in the summer of 1957, plaintiff had participated in a program of the United States Attorney's Office for the Southern District of New York in which his supervisor had been Fioravante G. Perrotta, Esq., then an Assistant United States Attorney and presently a partner at Rogers & Wells, and Mr. Perrotta might be called by plaintiff as a character witness, thus creating a conflict of interest for the firm; [5] (2) he had more recently disclosed confidential information to Mr. Perrotta and to another (unnamed) partner at Rogers & Wells; (3) both plaintiff and Rogers & Wells had represented "certain Iranian interests" since plaintiff had served as Special Counsel to a Ministry of the Imperial Iranian Government, and Rogers & Wells had at some point been counsel to an (again unnamed) "entity" in the United States which "has or had some connection with the Pahlevi Foundation and interests of the Shah"; and (4) Rogers & Wells had also represented defendant on certain legal matters arising in the aftermath of the "Lockheed Scandal" [6] which affected Iran. After hearing argument, we determined that the asserted grounds for disqualifying Rogers & Wells were frivolous, and on March 23 denied the motion.

On April 2, plaintiff did appear for his deposition. On that occasion, he objected to ten of defendant's requests for documents, primarily on the ground of relevance but also, in some instances, on the ground of privilege. Among the types of documents which he refused to deliver to defendant were documents regarding his medical condition, copies of his resume, and documents regarding services performed by him on behalf of persons or entities other than defendant since October 1974.

In the course of defendant's deposition of plaintiff, conducted on April 2, 4, 9 and 10, his counsel, Mr. Solomon, objected to and directed plaintiff not to answer some 122 questions. Most of these objections were on the ground of relevance, although again, some were based on assertions of privilege. Among the questions to which Mr. Solomon objected and which he directed plaintiff not to answer were questions regarding plaintiff's medical history; his leaves of absence for sickness while employed by defendant; and the termination of his employment with various law firms, the United States Treasury Department, the General Electric Corporation, and the Government of Iran.

By June 20, 1979—that is, six months after the filing of our memorandum of December 14, 1978—plaintiff had not initiated any discovery, and had failed to file the statement regarding his proposed proof at trial and the identities of his witnesses as required by the memorandum. Consequently, on July 10, by which time plaintiff still had neither initiated discovery nor filed any statement, defendant made a motion pursuant to Rule 41(b) of the Federal Rules of Civil Procedure for an order dismissing the plaintiff's action for failure to prosecute and for failure to comply for an order of this Court. In the alternative, defendant renewed its § 1404 motion to transfer the action to California. In addition, defendant moved for an order pursuant to Rule 37(b) of the Federal Rules of Civil Procedure dismissing the action because of plaintiff's failure to produce documents in compliance with the defendant's duly made request and his failure to answer the questions asked at his deposition, or, in the alternative, an order pursuant to Rule 37(a) compelling such discovery.

---

**5.** We take judicial notice that plaintiff's counsel, Mr. Solomon, in a case before Judge Sweet of this District in which he was the plaintiff, Solomon v. New York Law School, 77 Civ. 4824, attempted to have his opponent's counsel disqualified on ground of a supposed conflict of interest, and on the further ground that defendant's attorney would be a witness in the case. Judge Sweet denied that motion on August 29,

1978. From reading Judge Sweet's memorandum, we gather that Mr. Solomon had earlier brought another disqualification of counsel motion in another case in which he also was the plaintiff, this one in New York Supreme Court, New York County, which motion was denied by Justice Nadel.

**6.** *See* n.4 *supra.*

Sometime in early July, Mr. Solomon telephoned our chambers to request an extension of the time to complete discovery and to file the statement required by our December 14 memorandum, and he has since made a formal motion to that effect. He also apologized, and took full responsibility for the failure to comply with the deadline set by the memorandum. In essence, it appears that Mr. Solomon (1) on April 6, 1979, had been injured in an automobile accident which left him unable to perform his work with total efficiency; and (2) had been so involved with other cases, including one in this District in which he was the plaintiff,[7] that he "inadvertently forgot" about the June 20 deadline. At a hearing before us, Mr. Solomon admitted that in none of his other cases did he advise the court of his obligation to comply with our order. Nevertheless, Mr. Solomon insists that his actions, or lack thereof, while possibly negligent, did not constitute contumacious behavior or indifference to the direction of the court.

### Discussion

It is clear that this court has the inherent authority to dismiss plaintiff's action with prejudice because of his failure to prosecute. *See Link v. Wabash Railroad Co.* (1962) 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734. We are mindful, of course, that "[d]ismissal with prejudice is a harsh remedy to be utilized only in extreme situations." *Theilmann v. Rutland Hospital, Inc.* (2d Cir. 1972) 455 F.2d 853, 855. However, we are presently confronted with an "extreme situation" in which such a "harsh remedy" is required. The Supreme Court has held in *National Hockey League v. Metropolitan Hockey Club, Inc.* (1976) 427 U.S. 639, 643, 96 S.Ct. 2778, 2781, 49 L.Ed.2d 747, that

"the most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who

might be tempted to such conduct in the absence of such a deterrent."

The case before us offers a flagrant example of precisely the type of conduct by a party and his attorney which cannot be countenanced. Thus, in view of the contumacious behavior of both plaintiff and his counsel, Martin Paul Solomon, Esq., "the most severe" sanction of dismissal with prejudice must be imposed.

Rule 41(b) of the Federal Rules of Civil Procedure provides that: "For failure of the plaintiff to prosecute or to comply with these rules or any order of court, a defendant may move for dismissal of an action or of any claim against him." In the present case, plaintiff has (1) failed to prosecute his action with any diligence whatsoever; (2) frustrated the very purpose of the pre-trial discovery procedures mandated by the Federal Rules of Civil Procedure by speciously objecting on the ground of relevance to clearly relevant document requests and questions put to him at his deposition; and (3) failed to comply in any manner with our unambiguous order of December 14, 1978.

It is by now clearly established that "[d]ismissals under Rule 41(b) are, of course, largely a matter of the trial court's discretion." *Joseph Muller Corporation Zurich v. Societe Anonyme De Gerance Et D'Armement* (2d Cir. 1974) 508 F.2d 814, 815 (affirming our dismissal of a complaint for failure to prosecute). *See also, e. g., Link v. Wabash Railroad Company, supra,* 370 U.S. at 633, 82 S.Ct. 1386; *Ali v. A & G Company, Inc.* (2d Cir. 1976) 542 F.2d 595, 596; *Redac Project 6426, Inc. v. Allstate Insurance Company* (2d Cir. 1969) 412 F.2d 1043, 1046 ("It is well settled that neither a dismissal with prejudice for failure to prosecute nor a refusal to vacate such a judgment will be reversed on appeal except for abuse of discretion."); *Schwarz v. United States* (2d Cir. 1967) 384 F.2d 833, 835; *Taub v. Hale* (2d Cir. 1966) 355 F.2d 201, 202, *cert. denied* 384 U.S. 1007, 86 S.Ct. 1924, 16 L.Ed.2d 1020, *rehearing denied* 385 U.S. 924, 87 S.Ct. 225, 17 L.Ed.2d 148. *Cf.*

---

7. *See* n.5 *supra.*

*Schenck v. Bear, Stearns & Co., Inc.* (2d Cir. 1978) 583 F.2d 58. In view of the circumstances of the case before us, we deem it wholly appropriate for us to exercise our discretion and dismiss plaintiff's action with prejudice. Prior to reaching this conclusion, we have considered, as required by the Court of Appeals for this Circuit, *Schenck v. Bear, Stearns & Co., Inc., supra,* 583 F.2d at 60; *Ali v. A & G Company, Inc., supra,* 542 F.2d at 597, the possibility of instead imposing a lesser sanction, *i. e.,* transferring the action to the Central District of California pursuant to 28 U.S.C. § 1404(a). However, we are convinced that such lesser sanction would be inadequate.

This is an especially egregious case. Both plaintiff and his counsel, Mr. Solomon, have acted in "flagrant bad faith" throughout these proceedings, and Mr. Solomon in particular has demonstrated the most "callous disregard" of his responsibilities. *See National Hockey League v. Metropolitan Hockey Club, Inc., supra,* 427 U.S. at 643, 96 S.Ct. 2778. This is not a case of "but a single violation by counsel of a pre-trial directive", *Jackson v. Washington Monthly Co.* (D.C.Cir. 1977) 186 U.S.App.D.C. 288, 290, 569 F.2d 119, 121, or of an inadvertent or even negligent failure to comply with a rule of procedure or an order of the court. Rather, plaintiff and his attorney have repeatedly and contumaciously obstructed the orderly and expeditious disposition of this case.

To begin with, plaintiff's frivolous attempt to have defendant's counsel disqualified was nothing more than a crude and transparent delaying tactic which seriously inconvenienced defendant and needlessly wasted the court's time.

Furthermore, most of Mr. Solomon's objections to defendant's document requests and to the questions asked at plaintiff's deposition were specious and, in view of the nature of the action, had to have been made in bad faith. Documents regarding plaintiff's medical condition, copies of his resume, and documents regarding services performed by him on behalf of persons or entities other than defendant since October 1974 are clearly relevant to the issues raised in the complaint. Similarly, there could have been no legitimate good faith objections on the ground of relevance to questions regarding plaintiff's medical history, his leaves of absence for sickness while employed by defendant, and the termination of his employment with various law firms, the United States Treasury Department, the General Electric Corporation, and the Government of Iran. While we do not take into consideration the apparent impropriety of directing a witness at a deposition not to answer questions objected to on the ground of relevance,[8] we have no doubt that in directing plaintiff not to answer these questions Mr. Solomon could only have intended

---

**8.** Rule 30(c) of the Federal Rules of Civil Procedure provides that "[e]vidence objected to [at a deposition] *shall* be taken subject to the objections." (Emphasis added) It would therefore appear that an attorney who objects to a question on ground of relevance should do no more than state his objection on the record. It has been said that it is "highly improper" to instruct a deponent not to answer. *Ralston Purina Company v. McFarland* (4th Cir. 1977) 550 F.2d 967, 973. *See United States v. International Business Machines Corporation* (S.D.N.Y.1978) 79 F.R.D. 378, 381; *W. R. Grace & Co. v. Pullman Incorporated* (W.D.Okl.1977) 74 F.R.D. 80, 83–84; *Lloyd v. Cessna Aircraft Company* (E.D.Tenn.1977) 74 F.R.D. 518, 519–20; *Preyer v. United States Lines, Inc.* (E.D.Pa. 1973) 64 F.R.D. 430, *affirmed* (3d Cir.) 546 F.2d 418; *Shapiro v. Freeman* (S.D.N.Y.1965) 38 F.R.D. 308, 311–12; *Banco Nacional De Credito v. Bank of America Nat. Trust & Savings Ass'n* (N.D.Cal.1951) 11 F.R.D. 497, 499; *Dellefield v. Blockdel Realty Co.* (S.D.N.Y.1941) 40 F.Supp. 212. "It is not the prerogative of counsel, but of the court, to rule on objections." *Shapiro v. Freeman, supra,* 38 F.R.D. at 311.

We note, however, that a respected authority on federal practice has written that where questions are irrelevant to a pending action, "the deponent's only recourse is to decline to answer." 4A Moore's Federal Practice ¶ 37.-02[2] (2d ed. 1978), quoted in *Kamens v. Horizon Corp.* (S.D.N.Y.1979) 81 F.R.D. 444, 445. Whatever might be the correct rule when a party seeks to use discovery to harass his opponent or inquire into extraneous matters, it is clear in this case that defendant's inquiries were pertinent and that plaintiff's objections were—in most instances at least—interposed solely to frustrate defendant's legitimate discovery objectives.

to frustrate the very purpose of pre-trial discovery.

Finally, plaintiff's failure in any way to comply with our order of December 14, 1978, was contumacious. Plaintiff did not merely fail to *complete* his discovery within six months from the filing of the order; he did not even initiate any discovery within that time. Plaintiff has not put forward a single legitimate explanation for this utter disregard of an order of the court, and Mr. Solomon's proffered excuses are simply unacceptable. It goes without saying that Mr. Solomon's involvement in other litigation, including a case in this District in which he was the plaintiff,[9] cannot justify his or his client's failure to comply with our order for a period of six months.

Mr. Solomon has attempted to assume responsibility for the failure to comply with our December 14 order. However, as the Supreme Court observed in *Link v. Wabash Railroad Company, supra*, 370 U.S. at 633–34, 82 S.Ct. at 1390 (per Harlan, J.):

> "There is certainly no merit to the contention that dismissal of petitioner's claim because of his counsel's unexcused conduct imposes an unjust penalty on the client. Petitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of which can be charged upon the attorney.' *Smith v. Ayer*, 101 U.S. 320, 326, 25 L.Ed. 955."

*See also Theilmann v. Rutland Hospital, Inc., supra*, 455 F.2d at 856; *Kung v. FOM Investment Corporation* (9th Cir. 1977) 563 F.2d 1316, 1318. This is especially valid in the present case since plaintiff is himself an attorney of wide experience[10] and must, therefore, be held fully accountable for his counsel's dilatory tactics and contumacious behavior. *Cf. Jackson v. Washington Monthly Co., supra*, 186 U.S.App.D.C. at 291, 569 F.2d at 122; *McCargo v. Hedrick* (4th Cir. 1976) 545 F.2d 393, 396; *Reizakis v. Loy* (4th Cir. 1974) 490 F.2d 1132, 1136. In particular, plaintiff is chargeable with knowing the consequences of failing to comply with an order of the court. When he realized that his attorney was not taking any steps to initiate discovery or to file the statement identifying his New York witnesses and indicating the tenor of their testimony as required by our December 14 order, he should either have done so himself or hired another attorney.

Defendant's motion is granted, and plaintiff's action is dismissed for failure to prosecute. Plaintiff's motion for an extension of time to complete discovery and to file the statement referred to in our order of December 14, 1978, is dismissed as moot.

SO ORDERED.

---

9. *See* n.5 *supra.*

10. In an affidavit dated September 7, 1979, plaintiff asserts that "[a]lthough I am an attorney, I am not a trial attorney and have never appeared in litigation before." He has, however, had at least peripheral contact with litigation. *See Rene Boas and Associates v. Vernier* (1st Dept. 1965) 22 A.D.2d 561, 562, 257 N.Y. S.2d 487, 489.