818 A.2d 431 (2003)
358 N.J. Super. 484
CUMBERLAND COUNTY IMPROVEMENT AUTHORITY, Plaintiff-Appellant,
v.
GSP RECYCLING CO., INC. d/b/a Burno & D'Elia, Inc., Defendant-Respondent[1].
GSP Recycling Co., Inc., Plaintiff-Respondent,
v.
Cumberland County Improvement Authority, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued January 28, 2003.
Decided March 12, 2003.
*433 Todd W. Heck argued the cause for appellant (Basile & Testa, attorneys; Frank G. Basile and Mr. Heck, on the brief).
Joel B. Korin argued the cause for respondent (Kenney & Kearney, attorneys; Joseph T. Ciampoli, Roger Lai and Mr. Korin, on the brief).
Before Judges SKILLMAN, LEFELT and WINKELSTEIN. *432
*434 The opinion of the court was delivered by WINKELSTEIN, J.A.D.
Plaintiff Cumberland County Improvement Authority had an agreement with defendant GSP Recycling Co., a newspaper recycler, to supply GSP with newspapers plaintiff collected from the municipalities within the County. The materials plaintiff supplied to defendant failed to meet the agreement's quality specifications and defendant stopped paying plaintiff for the deliveries. Each party claimed the other breached the agreement. Following a bench trial, the trial judge dismissed plaintiff's claim against defendant, found that plaintiff breached the agreement, and awarded defendant $256,319.42 in damages. Plaintiff appeals. In applying the facts to the applicable provisions of the Uniform Commercial Code (U.C.C.), we affirm that portion of the judgment dismissing plaintiff's claim against defendant, but because defendant failed to establish that it sustained damages as a result of plaintiff's actions, we reverse the judgment in favor of defendant.

I
Due to the unique nature of the parties' agreement, a detailed recitation of the facts is necessary to place the issues in context. Plaintiff is an independent county authority responsible for recycling the newspaper generated by businesses and residences in Cumberland County. Defendant is engaged in the business of recycling old newsprint (ONP) to supply fiber to the Garden State Paper Mill, which produces recycled newsprint that is sold to major newspapers.
Because the recycled paper market is extremely volatile, long-term contracts are not atypical. They generally allow governmental entities to receive revenue for their recycled newspaper, rather than having to pay for its disposal, or look for a buyer on the spot market, while providing the purchasers with a stable source of paper.
In December 1991, the parties entered into a five-year contract (the agreement). Under its terms, plaintiff agreed to deliver to defendant a minimum of ten tons of ONP per month, and defendant agreed to purchase all of the newspaper plaintiff made available up to a maximum of fifty tons per month. At the beginning of each calendar year the parties could, "if mutually agreeable ... increase or decrease the contractual tonnage obligation."
Defendant would pay $20 per ton for the ONP, with the proviso that the price would be increased to $25 if plaintiff consistently delivered over 100 tons for a minimum of four months. The price would be adjusted at the end of each calendar year based on the Consumer Price Index.
The agreement addressed the quality of the newspaper:
6. All ONP shall be unbaled special news deink quality.... ONP shall contain no prohibitive materials and not more than one Percent (1.0%) outthrows. Failure to conform shall result in punitive deductions or total load rejections. In the event of a total load rejection, the county shall pay to GSP a charge of not more than thirty dollars ($30.00) per ton for the rejected load, and GSP shall dispose of the load.
Special news deink quality ONP is known as "# 8" or "grade 8" ONP. "Prohibitives" include aluminum cans, cardboard, garbage, glass, phone books, plastic bags and other non-newsprint materials. "Outthrows" include newspapers bundled with brown paper, or plastic straps, junk mail, magazines, and grocery bags. According to John Stanton, defendant's production *435 manager, all of defendant's contracts gave defendant the right to take punitive deductions and collect payment for load rejections. The punitive deduction compensated defendant for its additional sorting and transportation costs when it received lower quality material, while the $30 total load rejection charge covered the cost to dump it in a landfill if the load was completely unusable. Stanton testified, however, that defendant never directly assessed these charges. Instead, when the quality of the materials became "too dirty," defendant "[tried] to work with the community to get their quality up" because defendant wanted to encourage recycling programs. When the quality did not improve, "at worst case" defendant did not "pay for the fiber and... absorb[ed] any additional cost in sorting until it [became] so contaminated" that it was cost prohibitive. In other words, when the quality of ONP was below that which was called for in the agreement, instead of charging the supplier the $30 load rejection charge, or assessing a specific punitive deduction, defendant simply did not pay for the materials.
Under the Cumberland County recycling program, plaintiff lacked authority to refuse materials that were delivered by the municipalitiesit merely acted as a transfer station. Once the municipalities delivered the materials to plaintiff's facility, they were immediately loaded onto trucks and removed. Plaintiff had no sorting facility or storage capability.
From the outset, plaintiff failed to meet the agreement's restrictions on prohibitives and outthrows. The percentage of prohibitives and outthrows delivered to plaintiff by the municipalities, and then delivered to defendant, was consistently higher than permitted under the agreement.
To help address plaintiff's problem meeting quality standards, the parties executed an addendum to the agreement on July 6, 1993, (the addendum). In the addendum, paragraph 6 of the agreement was replaced by Items 6A and 6B, which read as follows:
ITEM 6 A
All ONP delivered to our Garfield mill shall be unbaled Special News Deink Quality.... ONP shall contain no prohibitive materials and not more than one percent (1.0%) outthrows. Failure to conform shall result in punitive deductions or total load rejections. In the event of a total load rejection, the county shall pay to GSP a charge of not more than thirty dollars ($30.00) per ton for the rejected load, and GSP shall dispose of the load.
ITEM 6 B
All ONP delivered to our Carteret facility shall be unbaled GSP Mixed News conforming to the attached GSP Service Requirements. ONP shall contain no more than one-half percent (0.5%) prohibitive materials and not more than eight percent (8.0%) outthrows.
Under the terms of the addendum, plaintiff had a choice of delivering two different qualities of ONP. According to Item 6A, defendant's Garfield mill would accept deliveries of # 8 ONP, also known as "clean news," and pay $25 per ton. The remaining provisions of Item 6A were identical to those of paragraph 6 of the agreement. Item 6B was new. It provided plaintiff with the option of delivering to defendant's Carteret facility "mixed news" ONP, known as "# 6" or "grade 6" ONP. Defendant's payment to plaintiff for # 6 would be $15 per ton, recognizing a forty-percent price reduction from grade 8 ONP to account for defendant's increased sorting expenses due to the higher percentage *436 (eight percent) of outthrows contained in grade 6.
The amount of tonnage to be delivered was also changed in the addendum. Plaintiff was to deliver a minimum of 200 tons of ONP per month; and defendant's obligation was "to purchase all of the newspaper," not to "exceed a maximum of 300 tons per month," with a right of first refusal on the excess. The addendum did not require that the minimum tonnage to be provided by plaintiff be a specific grade of ONP. In other words, plaintiff had the option of providing either # 6 or # 8 ONP.
After the addendum was signed, plaintiff sent all of its ONPbetween 200 and 300 tons per monthto the Carteret mill. Beginning on August 24, 1993, however, defendant stopped paying for the deliveries. On September 8, 1993, Stanton wrote to Rick Mather, plaintiff's facilities manager, that the quality of the ONP was below an acceptable level because the ONP contained a high percentage of outthrows. He did not, however, request an adjustment in price, or mention his company's failure to pay the outstanding invoices. At about that time, plaintiff sent Stanton a letter demanding payment of invoices from deliveries on August 24, 25, 27, and 31, 1993, but plaintiff continued to make deliveries to defendant through January 1994 despite defendant's failure to pay for the deliveries.
Ultimately, GSP paid for only eight of 105 loads that plaintiff delivered to Carteret between August 24, 1993, and January 28, 1994. The total amount due for the unpaid invoices was $17,035.83. Stanton took the position that defendant expected plaintiff to continue to send the loads, without being paid. Plaintiff disagreed, claiming it should be paid. The parties do not dispute, however, that despite the lack of payment for the deliveries, defendant continued to supply fiber from the deliveries to the Garden State Paper Mill.
The quality of the newspaper continued to be "a consistent problem," and the parties continued to discuss alternatives. In January 1994, Stanton offered to pay $2 per ton, down from $15 per ton, for plaintiff's ONP, which was found to contain outthrows up to twelve percent. He also offered to terminate the agreement. He said: "If you find this offer to be non-acceptable we will allow a release from our Agreement. We would mutually agree to dissolve our Contract. You would therefore be free to utilize any other markets you desire." Plaintiff did not respond to defendant's offer. Instead, the following month, plaintiff launched "an aggressive educational and public relations campaign" to help correct the quality problems. Mather requested that the contract be put "on hold" for six months while plaintiff sent the newspaper to local brokers, where the quality of the newspaper was not a material problem, because plaintiff expected the education campaign to "take some time to achieve satisfactory results."
As part of its attempt to improve quality, plaintiff hired a full-time recycling coordinator. Despite his efforts, the quality of the product remained essentially unchanged. Plaintiff also considered upgrading the facility's equipment to include machinery which would sort the ONP, but the cost of the machinery was prohibitive.
By June 1994, plaintiff began to send its materials to other recyclers. Although the parties continued to discuss alternate prices for the materials, plaintiff sent no further deliveries to defendant after May 1994. The undisputed testimony of plaintiff's executive director was that the ONP sent to the other recyclers never even met the quality standards for # 6 ONP, let alone for # 8 ONP.
*437 Allegedly to replace the paper plaintiff failed to deliver, in May or June 1994, defendant began to purchase # 8 ONP in the spot market. Stanton explained that at that time the difference between # 8 ONP and # 6 ONP "was not significant so it was just as easy for us to buy the number eight." Because the usual spot market price difference between # 6 ONP and # 8 ONP was insufficient to offset defendant's costs to process # 6 ONP into # 8 ONP, it preferred just to purchase # 8 ONP. Beginning in February 1996, defendant, pursuant to a contract, obtained # 8 ONP from Fairfield County (Tennessee) Redemption (FCR) "partially to replace the tonnage that [defendant was not] getting from [plaintiff]."
At trial, defendant's damages expert, Donald DiGrazia, based his calculations on the price defendant paid to spot market vendors for # 8 ONP, from which he subtracted the $25 per ton contract price for # 8 ONP, and multiplied the difference by plaintiff's actual total monthly output from June 1994 through December 1996. He assumed that plaintiff's output for that time met the agreement's quality standards for # 8 ONP. Using this method, DiGrazia concluded that defendant's damages were $417,325. Based on alternate calculations, he computed defendant's damages at $665,257, or $713,370 if transportation costs to Tennessee for the FCR deliveries were included.
Not surprisingly, plaintiff's expert, Raymond Ciccone, had a different take on damages. He concluded that defendant had no damages. He reasoned that defendant had no need to resort to the spot market because defendant purchased more than was needed to satisfy the agreement's requirements from "walk-ins," allowing defendant to pay an average price for these materials which was less than defendant was obligated to pay plaintiff under the addendum for # 6 ONP.

II
The trial court rejected plaintiff's contention that defendant had breached the agreement when it refused to pay plaintiff for the deliveries. Rather, it determined that plaintiff breached the agreement, and as a result, defendant was entitled to "cover" damages under N.J.S.A. 12A:2-712. Because the judge found that the agreement was a "five-year continuing supply contract," he also rejected plaintiff's assertion that the damages should be fixed at the time of the initial breach, May or June 1994. The court agreed with defendant's expert that spot market prices were the proper measure of damages, but rejected the expert's methodology which relied upon the spot market price for # 8 ONP. Instead, finding that plaintiff was required to supply only # 6 ONP, at a contract price of $15 per ton, forty percent less than the contract price of $25 per ton for # 8 ONP, the judge concluded that the proper price for defendant's cover costs was the median spot market price for # 8 ONP for each month that remained for the duration of the agreement, reduced by forty percent (representing sorting costs), less the $15 per ton contract price for # 6 ONP. He multiplied that figure by plaintiff's actual total monthly ONP output between June 1994 and December 1996, fixing damages at $256,319.42. The judge rejected defendant's claim for transportation costs.

III
We first address plaintiff's affirmative claim that defendant breached the agreement. We agree with the trial judge that defendant did not breach the agreement when it failed to pay for the deliveries *438 plaintiff made between August 1993 and January 1994.
A significant issue at trial was whether the punitive deductions and total load rejection charges included in paragraph 6 of the agreement, and in Item 6A of the addendum, which contemplated delivery of # 8 ONP only, also applied to deliveries of # 6 ONP under the terms of Item 6B of the addendum. Plaintiff claims the punitive deductions and total load rejection charges applied only to # 8 ONP, while defendant asserts the charges apply to both # 8 and # 6 ONP. Thus, plaintiff claims the addendum did not give defendant the right to take punitive deductions against nonconforming # 6 ONP. When read literally, the language of the addendum supports plaintiff's position. The addendum does not specifically say that for deliveries of # 6 ONP defendant had the option not to pay for nonconforming loads, or to charge for total load rejections.
Where the terms of a contract are clear, the court must enforce the contract as written. Morris County v. Fauver, 153 N.J. 80, 103, 707 A.2d 958 (1998); City of Orange Tp. v. Empire Mortgage Servs., Inc., 341 N.J.Super. 216, 224, 775 A.2d 174 (App.Div.2001). However, the terms of the parties' written agreement may be explained or supplemented by evidence of their course of dealing. N.J.S.A. 12A:2-202(a); N.J.S.A. 12A:1-205.
Here, defendant argues that despite the failure to include the punitive load deduction and load rejection clauses in Item 6B, both parties understood that defendant had the right to take punitive deductions for below standard # 6 ONP. Without this reservationthe ability to take deductions for nonconforming goodsdefendant points out that the quality standards set forth in the addendum would have been meaningless.
Defendant is correct. Under Item 6B, the ONP was to contain no more than eight percent outthrows. Without dispute, the materials exceeded those levels. In September 1993 they averaged over twelve percent, and continued above ten percent throughout the duration of the deliveries. Unless the parties intended to allow defendant the right to impose punitive deductions if the quality of the # 6 ONP was below what the agreement required, the language in Item 6B restricting the percentage of outthrows to eight percent would have no meaning. Said another way, to interpret the addendum in the manner suggested by plaintiff would give meaning to the outthrow limitation in Item 6A, but render hollow the outthrow limitation in Item 6B.
We are guided in our determination by basic precepts of contract construction. The document must be read as a whole, in "accord with justice and common sense." Krosnowski v. Krosnowski and Garford Trucking, Inc., 22 N.J. 376, 387, 126 A.2d 182 (1956). It should not be interpreted to render one of its terms meaningless. "Literalism must give way to context." Borough of Princeton v. Bd. of Chosen Freeholders of County of Mercer, 333 N.J.Super. 310, 325, 755 A.2d 637 (App.Div.2000), aff'd, 169 N.J. 135, 777 A.2d 19 (2001). Having reviewed the evidence in light of these principles, we conclude that the parties intended to apply the punitive deductions and total load rejection charges to both # 6 and # 8 ONP.
The parties' course of dealing during the period of continued deliveries supports this interpretation. Plaintiff never informed defendant that it considered defendant's practice of not paying for the materials, which did not meet the quality standards for either # 6 or # 8 ONP, to be contrary to the parties' agreement. Even while sending several loads a week to defendant *439 between August 1993 and January 1994 for which it received no payment, plaintiff never questioned defendant's right to take punitive deductions. Nor did plaintiff make payment of the unpaid invoices a condition of resuming deliveries. Not until it filed the lawsuit, did plaintiff dispute defendant's right to take the deductions. Consequently, the parties' course of dealing supports defendant's position that its failure to pay the invoices for the nonconforming # 6 ONP was not a breach of the parties' agreement.
We next turn to plaintiff's claim that defendant's conduct constituted "acceptance" of the nonconforming ONP within the meaning of N.J.S.A. 12A:2-606, which requires a buyer to pay the contract price for the goods it accepts or be in breach. To support its argument, plaintiff submits that defendant's actual use of the goods was "inconsistent with [plaintiff's] ownership of those shipments." Plaintiff asserts that N.J.S.A. 12A:2-607(1), which states that "[t]he buyer must pay at the contract rate for any goods accepted," required defendant to make payment. This argument fails, however, because, as we just explained, the agreement contemplates that when the goods did not meet quality standards, which plaintiff concedes they did not, defendant had both the right to retain them and to take a punitive deduction as compensation for the additional costs it would incur for sorting and transportation. It was not required to pay the contract price for the goods that did not meet quality standards. The terms of the agreement render N.J.S.A. 12A:2-607(1) inapplicable under these circumstances.
Nonetheless, because the parties' agreement constituted an installment contract pursuant to N.J.S.A. 12A:2-612(1)it "require[d] or authorize[d] the delivery of goods in separate lots to be separately accepted," plaintiff contends that defendant's failure to pay the invoices for the ninety-seven loads that defendant had "accepted," substantially impaired the value of the entire agreement. See N.J.S.A. 12A:2-612(3), which provides that "[w]henever non-conformity or default with respect to one or more installments substantially impairs the value of the whole contract there is a breach of the whole." Yet, for the same reasons N.J.S.A. 12A:2-607(1) did not apply, neither does N.J.S.A. 12A:2-612. The delivered goods did not conform to the agreement's specifications, which permitted defendant to deny payment. Said another way, the agreement anticipated nonpayment for nonconforming goods.
Next, plaintiff argues that it was entitled to treat defendant as being in breach of the agreement based on the right to adequate assurance of performance afforded by N.J.S.A. 12A:2-609. Under N.J.S.A. 12A:2-609(1):
A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.
The statute further provides that "[a]fter receipt of a justified demand failure to provide within a reasonable time not exceeding thirty days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract." N.J.S.A. 12A:2-609(4). Specifically, plaintiff argues that defendant's failure to provide adequate assurances within thirty days after plaintiff's demand for assurances constituted *440 a repudiation of the contract. However, although plaintiff sent invoices to defendant every two weeks, the record does not show that plaintiff, either verbally or in writing, demanded assurances.
Whether a demand for assurances may be made verbally or needs to be in writing is unsettled. Comment (1) to N.J.S.A. 12A:2-609, and the language of N.J.S.A. 12A:2-609(1) (when grounds for insecurity arise, either party "may in writing demand adequate assurance of due performance"), appear to indicate that the demand needs to be in writing. See also Simcala, Inc. v. Am. Coal Trade, Inc., 821 So.2d 197, 204 (Ala.2001); S & S, Inc. v. Meyer, 478 N.W.2d 857, 862-63 (Iowa Ct.App.1991). Other courts have found verbal demands are sufficient so long as the demand clearly conveys the insecure party's intent to suspend performance in the absence of adequate assurances. Diskmakers, Inc. v. DeWitt Equip. Corp., 555 F.2d 1177, 1180 (3d Cir.1977) (applying New Jersey law); Scott v. Crown, 765 P.2d 1043, 1046-47 (Colo.Ct.App.1988); Atwood-Kellogg, Inc. v. Nickeson Farms, 602 N.W.2d 749, 753 (S.D.1999). But, here, we need not resolve that issue because plaintiff is unable to point to any written or verbal demand that conveyed plaintiff's intent to terminate deliveries if defendant either refused to pay the past-due invoices, or refused to pay for future deliveries. On the contrary, for more than five months plaintiff continued to make deliveries without receiving payment. Thus, plaintiff is unable to establish that it was entitled to treat defendant as having breached the parties' agreement due to defendant's failure to provide adequate assurances.

IV
Having concluded that plaintiff failed to prove that defendant breached the agreement, we turn to plaintiff's alternative argument, that defendant failed to prove damages. Because we agree with plaintiff's position on this issue, we will assume, for purposes of this discussion, that plaintiff breached the agreement.[2]
In arriving at our conclusion, we are mindful that an appellate court is directed to be deferential to a trial court's factual findings and uphold its conclusions of law, so long as they are supported by adequate, substantial, credible evidence in the record. Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 483-84, 323 A.2d 495 (1974). Here, the evidence does not support the judge's conclusions.
The U.C.C. provides a buyer with alternative remedies in the event of a seller's breach. See N.J.S.A. 12A:2-711. As a general rule, "the U.C.C.'s remedies are to be `liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed.'" Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 426, 690 A.2d 575 (1997); N.J.S.A. 12A:1-106(1).
Here, the trial court found that defendant "covered" the shortfall from plaintiff's breach by its spot market purchases throughout the period remaining in the parties' contract. We disagree. Under N.J.S.A. 12A:2-712:
(1) After a breach within [N.J.S.A. 12A:2-711] the buyer may "cover" by making in good faith and without unreasonable delay any reasonable purchase *441 of or contract to purchase goods in substitution for those due from the seller.
(2) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (12A:2-715), but less expenses saved in consequence of the seller's breach.
(3) Failure of the buyer to effect cover within this section does not bar him from any other remedy.
As the accompanying New Jersey Study Comment (1) makes clear, the purpose of N.J.S.A. 12A:2-712 is to permit an aggrieved buyer who "needs goods for himself or for resale purposes" to purchase goods as a substitute for those due from the seller. Goods purchased in the open market to meet the buyer's own needs, as distinguished from goods purchased specifically for the seller's account, do not constitute "cover." Jamestown Farmers Elevator, Inc. v. Gen'l Mills, Inc., 552 F.2d 1285, 1293 (8th Cir.1977); 4A Anderson on The Uniform Commercial Code § 2-712:37 (3d Ed.1997). A buyer does not cover unless it makes an actual purchase to take the place of the goods it expected from the seller under the contract. Ralston Purina Co. v. McFarland, 550 F.2d 967, 971 (4th Cir.1977); Anderson, supra, at § 2-712:44.
In this case, the parties agreed plaintiff would supply a minimum of 200 tons of ONP to defendant on a monthly basis for a five-year period, until December 1996. Contrary to N.J.S.A. 12A:2-712(1), defendant offered no evidence that in May or June 1994, when the court assumed the breach occurred, defendant made any attempt to secure a contract to purchase goods specifically to take the place of those not delivered by plaintiff. Defendant did not secure the FCR contract until February 1996, almost two years after plaintiff's deliveries to defendant ceased. DiGrazia's damages estimate was not based on any contract that defendant secured to replace the ONP that remained undelivered from plaintiff. He gave no consideration to whether the purchases actually were made to cover plaintiff's breach, or whether they would have occurred anyway. See Ralston Purina, supra, 550 F.2d at 971-74.
If a buyer does not cover, it can claim damages under N.J.S.A. 12A:2-713, which provides:
(1) Subject to the provisions of this Chapter with respect to proof of market price (12A:2-723), the measure of damages for non-delivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this Chapter (12A:2-715), but less expenses saved in consequence of the seller's breach.
Although N.J.S.A. 12A:2-713 measures damages on the basis of market price, it specifies that the calculation must be measured "at the time when the buyer learned of the breach." Nothing in this statute supports the trial court's method of calculating damages based on successive market prices. Said differently, there was no legal or factual basis for the trial court's decision to allow defendant "cover" damages at the spot market rate for each month that remained under the contract. Neither N.J.S.A. 12A:2-712 nor N.J.S.A. 12A:2-713 provides for such a remedy.
Additionally, the trial judge's formula to calculate the price of ONP to be used for damages lacked evidential support in the record. He based his calculations on a hypothetical market price for # 6 ONP, and deducted the forty-percent price differential between the contract prices of *442 # 6 ONP and # 8 ONP from the fluctuating spot market price for # 8 ONP. By doing so, he necessarily presumed, without factual support, that the sorting costs associated with the processing of # 6 ONP, which had justified the forty-percent lower contract price, would remain at forty percent notwithstanding the fluctuations of the market price for # 8 ONP. This was error. The following example shows why. In June 1994 the spot market price for # 8 ONP was $26. The judge deducted forty percent, or $11, for sorting costs. In December 1994, when the spot market price for # 8 ONP rose to $100, the judge again deducted forty percent, which is $40, for the cost of sorting the prohibitives and outthrows. In other words, the judge found that to sort one ton of # 8 ONP when it sold for $26 per ton would be $11, while performing the same tasks to sort one ton of # 8 ONP when its market price was $100 per ton, would be $40. The record simply does not contain any evidence to support a conclusion that it would take more time or more labor to sort one ton of ONP when it cost $100 per ton than when it cost $26 per ton.
Defendant had the burden of proof to establish all elements of its cause of action, including damages. Snyder v. I. Jay Realty Co., 53 N.J.Super. 336, 347, 147 A.2d 572 (App.Div.1958), aff'd in part, rev'd in part on other grounds, 30 N.J. 303, 153 A.2d 1 (1959). As to damages for nondelivery pursuant to N.J.S.A. 12A:2-713(1), the injured party must prove "the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in [N.J.S.A. 12A:2-715], but less expenses saved in consequence of the seller's breach." Gulf Chem. & Metallurgical Corp. v. Sylvan Chem. Corp., 122 N.J.Super. 499, 505, 300 A.2d 878 (Law Div.) (quoting N.J.S.A. 12A:2-713(1)), aff'd, 126 N.J.Super. 261, 314 A.2d 73 (App.Div. 1973), certif. denied, 64 N.J. 507, 317 A.2d 720 (1974); see also Three-Seventy Leasing Corp. v. Ampex Corp., 528 F.2d 993, 997-98 (5th Cir.1976) (noting that damages for nondelivery by seller is difference between market price at time of breach and contract price, together with incidental or consequential damages); Burgess v. Curly Olney's, Inc., 198 Neb. 153, 251 N.W.2d 888, 891 (1977) (same).
Here, defendant did not offer evidence to show what the market price for # 6 ONP was at the time plaintiff ceased its deliveries. The only product cost evidence was for # 8 ONP. Without evidence of the cost for # 6 ONP, the trial judge was left to speculate on the extent of defendant's damages.
Additionally, when the judge calculated damages, he assumed that plaintiff's ONP output met defendant's quality requirements for # 6 ONP. The record does not support such a conclusion; to the contrary, plaintiff's materials had never complied with that standard in the past, and plaintiff's executive director's uncontradicted testimony was that the product plaintiff sold to other recyclers between June 1994 and December 1996 did not meet the agreement's standards for # 6 ONP.
Plaintiff is also correct that no basis existed for the court's decision to use the entire amount of plaintiff's output rather than the agreement's 200-ton minimum. Nothing in the addendum required plaintiff to provide defendant with all of its output, regardless of quality. Plaintiff cannot be held liable for failing to send defendant material that the agreement did not require it to send.
Given the court's flawed analysis and defendant's failure to offer evidence of the market price for # 6 ONP at the time of plaintiff's alleged breach of the agreement, *443 the judgment against plaintiff cannot stand. Defendant's claims are dismissed with prejudice.
We affirm the judgment dismissing plaintiff's claim against defendant and reverse the judgment in favor of defendant.
NOTES
[1] This case, with Cumberland County Improvement Authority as a plaintiff, was filed in the Law Division in Cumberland County, docket no. L-844-95. The second action, with GSP Recycling as the plaintiff, was filed in the Chancery Division in Bergen County, docket no. CH-311-95. By order of October 17, 1995, they were consolidated in the Chancery Division in Cumberland County, docket no. C-35-96. For purposes of this opinion, Cumberland County Improvement Authority is referred to as "plaintiff" and GSP Recycling is referred to as "defendant."
[2] We therefore find it unnecessary to address plaintiff's arguments that it did not breach the agreement because its performance was excused under 1) the UCC doctrine of "commercial frustration," N.J.S.A. 12A:2-615, and 2) the language of the agreement's force majeure clause.