

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-13-2006

# Alexander v. Natl Fire Ins Co

Precedential or Non-Precedential: Precedential

Docket No. 05-1560

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Alexander v. Natl Fire Ins Co" (2006). *2006 Decisions.* Paper 661.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/661

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 05-1560
_____

JEFFREY ALEXANDER; GAIL ALEXANDER

v.

NATIONAL FIRE INSURANCE OF HARTFORD,
<u>Appellant</u>

v.

SHELBY INSURANCE COMPANY;
UNITED STATES FIDELITY AND GUARANTY
COMPANY,
<u>Third-Party Defendants</u>

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 03-cv-01511)
District Judges: The Honorable Michael M. Baylson
and Juan R. Sanchez

_____

Argued June 13, 2006

Before:  FISHER, ALDISERT and LOURIE,[*] <u>Circuit Judges</u>.

(Filed July 13, 2006)

Steven J. Polansky, Esq. (ARGUED)
Walter F. Kawalec, III, Esq.
Marshall, Dennehey, Warner, Coleman & Goggin
200 Lake Drive East, Suite 300
Cherry Hill, NJ 08012

      Counsel for Appellant

Allan C. Molotsky, Esq. (ARGUED)
Tracey N. Kilcullen, Esq.
Post & Schell, P.C.
1600 J.F.K. Boulevard
Four Penn Center, 13th Floor
Philadelphia, PA 19103

      Counsel for Appellees and Third-Party Defendants

_____

OPINION OF THE COURT
_____

ALDISERT, <u>Circuit Judge</u>.

     This appeal by National Fire Insurance Company of

_____

    [*]The Honorable Alan D. Lourie, United States Circuit Judge for the Federal Circuit, sitting by designation.

Hartford ("National Fire"), the insurer of the Sunnyside Up Condominium Association, requires us to decide whether its policy covers claims incurred when a second-story exterior wooden deck attached to one of the association's units collapsed and caused injuries to a number of people who were on the deck. The unit was owned by Jeffrey and Gail Alexander. After National Fire refused to defend or participate in the settlement of the personal injury claims, the Alexanders filed a complaint in the United States District Court for the Eastern District of Pennsylvania seeking to declare that National Fire's policy issued to the Condominium Association covered the incident. In a summary judgment dated March 3, 2004, the District Court determined that the Alexanders' loss was indeed covered by the National Fire policy. In a later summary judgment dated January 19, 2005, the District Court held that the coverage provided by National Fire for this loss was primary, and that the two policies issued separately to the Alexanders by third-party defendants Shelby Insurance Co. and United States Fidelity and Guaranty Company ("USF&G") were excess. National Fire appeals both grants of summary judgment. We will affirm.[1]

I.

A.

The Sunnyside Up Condominium Association, which is located in Sea Isle City, New Jersey, consists of two

---

[1] The District Court had jurisdiction over this diversity action pursuant to 28 U.S.C. § 1332. We have jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1291.

3

condominium units—one on the first floor and one, the Alexanders', on the second—both of which had wooden decks, stacked one on top of the other. From August 25 to September 1, 2001, the Alexanders leased their unit to Agnes Cunningham. On August 26, 2001, the Alexanders' deck collapsed with 11 people on it. Following the collapse, negligence causes of action were brought against the Alexanders in the New Jersey Superior Court in Cape May County that alleged that the collapse was caused by the Alexanders' negligent construction and maintenance of the deck. Those claims have all been settled, so what remains is the allocation of the payment of the settlement and defense costs among the three insurance companies who are parties to the present suit.

B.

Following the collapse, the Alexanders hired a contractor, Dennis A. Funk, to examine the damage. After inspecting the deck, Funk drafted a letter that detailed the construction of the deck and the reasons for its collapse. Funk's letter was presented to the District Court in the instant litigation, and because National Fire did not object to its introduction, the Court considered the letter as "stating uncontested facts." Mar. 3, 2004 D. Ct. Op., app. at 324a. The relevant portions of Funk's letter are as follows:

> While reviewing the photos of the deck collapse the other day in your office it was clear what caused the support system to fail. But first I would like to describe how the deck was constructed. At the house bound side the deck

4

joists were supported against the ledge board using a series of metal joist hangers. Those hangers support the joists with a small shelf that fits up under the bottom side of the joist. The ledger is installed first, followed usually by the joist hangers, then the joists, and the finally [sic] the decking. Joist hangers are used at this end because the joists cannot be nailed through the ledger board, they can only be toe-nailed to the ledger board. Prior to the common use of joist hangers, a wood shelf, usually a wood 2 x 4 or a 2 x 3 was nailed to the ledger and the deck joists were notched to sit ontop [sic] of this shelf. *On the outward end of this deck, the deck joists were attached to the deck box joist by nailing through the box joist into the individual joist ends. After the joists were nailed another box joist was installed on the outward end to support the decking system between the 4 x 4 vertical columns.*

*The failure of the deck system occurred due to the deterioration of the nails used to support the outbound end of the deck joists. . . . .*

Letter of Dennis Funk, app. at 37a (emphasis added).[2]

---

[2] National Fire used drawings in its appellate brief to illustrate the explanation given by Funk. The Alexanders argue that this is an improper supplementation of the evidence in the appellate record. Alexanders Br. at 34 (citing Rule 10(a),

C.

The Condominium Association was organized under a Master Deed of Declaration of Condominium (the "Master Deed"). Relevant to the present dispute, Subsection F of the Master Deed addresses the Alexanders' deck as follows:

F.      COMMON ELEMENTS

1.      Common Elements subject to Exclusive Easements:

   a.      Any balcony or patio to which there is a direct access from the interior of a unit shall constitute a common element subject to exclusive easement for the exclusive use of the owner of such

---

Federal Rules of Appellate Procedure). Because our resolution of this appeal will be based upon the interaction of the terms of the Master Deed, the National Fire policy and the New Jersey Condominium Act, rather than the factual distinctions illustrated in the drawings, we need not delve into this question. See infra sections III-IV.

6

unit. The unit owner shall be responsible for the removal of snow from any such balcony or patio and for the maintenance and repair of the same which shall not be a common expense.

Master Deed, app. at 134a. Subsection G specified that the owners of both units shall each have a 50% interest in the Association's common elements, and Subsection L specified that common expenses, as defined by the New Jersey Condominium Act, N.J. Stat. Ann. §§ 46:8B-1 to -38 (2006), shall be shared equally between the two unit owners. Master Deed, app. at 135a-138a. Subsection N of the Master Deed addressed the owners' duties of maintenance and repair as follows:

> N. MAINTENANCE AND REPAIR: The Association, at its expense shall be responsible for the cleaning, maintenance, repair and any required replacement of the Common Elements, as defined by the Condominium Act which include . . . any and all erection permitted to be constructed on said common area under the Zoning Laws of the City of Sea Isle City, etc. Individual Condominium Unit Owners shall be responsible at their own expense for the maintenance, repair and replacement of all portions of their individual Units as defined by the

> Condominium Act, which responsibility shall include the maintenance and repair of the inside of all walls forming or dividing each Condominium Unit, plumbing systems, electrical systems, interior side of windows, etc., within each unit. . . .

Master Deed, app. at 138a.

Significant to this latter provision, on May 28, 1997, one of the two 4x4 vertical post columns supporting the deck was replaced. The costs of this repair were apparently split equally between the unit owners. These vertical posts, however, were not the components of the deck that failed.

### D.

At the time of the deck collapse, the Alexanders maintained condominium unit insurance coverage with USF&G. They also maintained separate homeowners liability and umbrella liability insurance coverage with Shelby. As heretofore stated, the Condominium Association maintained insurance coverage with National Fire.[3] The National Fire

---

[3] Subsection O of the Master Deed required that such coverage be maintained:

> O.    INSURANCE: The Association shall arrange for casualty insurance coverage to cover the Common Elements. . . . All insurance coverage purchased by the Association shall be for the benefit of the

policy provided first-party property coverage and third-party general liability coverage to the Condominium Association.

The National Fire policy generally described the rights of the insured as follows:

> **1.** **Insuring Agreement**
>
> > **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. . . .

National Fire policy, app. at 95a.

---

Association, each Condominium Unit Owner and for their respective Mortgagees as their respective interests may appear. . . .

Master Deed, app. at 140a.

The National Fire policy also contained an endorsement CG20041185 that made the individual unit owners, such as the Alexanders, insureds, but only under limited circumstances:

**ADDITIONAL INSURED -
CONDOMINIUM UNIT OWNERS**

* * *

WHO IS AN INSURED (Section II) is amended to include as an insured each individual unit owner of the insured condominium, but only with respect to liability arising out of the ownership, maintenance or repair of that portion of the premises which is not reserved for that unit owner's exclusive use or occupancy.

National Fire policy, app. at 107a.

Pursuant to these policies, at all relevant times in the deck collapse litigation, the Alexanders were defended by third-party defendants Shelby and/or USF&G. At some point in the underlying litigation, National Fire refused to provide coverage to the Alexanders. This refusal sparked the current dispute.

II.

On March 3, 2003, the Alexanders filed a declaratory judgment action against National Fire in the District Court. District Judge Baylson presided over this stage of the litigation. In their complaint, the Alexanders sought a declaration that National Fire is obligated (1) to cover the Alexanders as

10

additional insureds under the Condominium Association's policy; (2) to defend and indemnify them in the underlying litigation; and (3) to reimburse the Alexanders for their defense fees and those fees incurred for the present action. Compl., app. at 16a. National Fire filed its answer on May 23, 2003. National Fire and the Alexanders filed cross-motions for summary judgment on October 14 and October 15, 2003, respectively. In its motion for summary judgment, National Fire argued that it was not obligated to cover the Alexanders as additional insureds because the deck was reserved for the Alexanders' exclusive use and was therefore not a common element. National Fire Mot. for Summ. J., supp. app. at 5.

In a memorandum opinion dated March 3, 2004, the District Court granted the Alexanders' motion for summary judgment. The Court held that National Fire's policy covered the Alexanders as additional insureds because the portion of the deck structure that collapsed was a common element. It did, however, decline to make a final judgment on whether National Fire's policy constituted excess or primary coverage because the Court concluded that the issue could not be addressed without the joinder of Shelby, which it described as an "indispensable party."

Both parties moved for reconsideration. The Court denied both motions in a May 5, 2004 opinion. Additionally, on that date, the Court permitted National Fire to file a third-party complaint against Shelby and USF&G, which National Fire filed on June 16, 2004. Following the filing of answers from Shelby and USF&G, the question of the primacy of National Fire's insurance coverage could then be adjudicated.

On August 4, 2004, the case was transferred from District Judge Baylson to District Judge Sanchez. National Fire then filed a motion for summary judgment on October 25, 2004 on the issues of the primacy of its coverage and the allocation of the costs of the underlying litigation. Shelby and USF&G filed a joint cross-motion for summary judgment on November 8, 2004 on these same issues.

In an opinion dated January 19, 2005, the Court granted Shelby's and USF&G's motion for summary judgment, concluding that National Fire's coverage was primary and Shelby's and USF&G's were excess. National Fire was subsequently ordered to reimburse Shelby and USF&G for all legal fees and judgment and settlement payments incurred in the underlying tort litigation. This appeal of both grants of summary judgment followed.[4]

---

[4] Because this is an appeal from grants of summary judgment, our review is plenary. Oritani Sav. and Loan Ass'n v. Fid. and Deposit Co. of Maryland, 989 F.2d 635, 637 (3d Cir. 1993). "On review the appellate court is required to apply the same test the district court should have utilized initially." Id. (citation and quotations omitted). "A court may grant summary judgment only when the submissions in the record 'show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Id. (quoting Rule 56(c), Federal Rules of Civil Procedure). "In determining whether summary judgment is appropriate, '[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255

III.

A.

This appeal requires us to address the interaction of the Alexanders' Master Deed, the New Jersey Condominium Act, and the relevant insurance policies issued by National Fire, Shelby and USF&G. In so doing, we must first determine how New Jersey courts treat these rules and documents. To this end, we observe that both a condominium deed and the Condominium Act are regarded as defining the "rights and responsibilities of a condominium unit owner and a governing association." Davis v. Metuchen Gardens Condo. Ass'n, 790 A.2d 184, 185 (N.J. Super. Ct. App. Div. 2002).

In considering the treatment of insurance policies, however, we note "that although insurance policies are

_____

(1986)). "The inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Id. (quoting Anderson, 477 U.S. at 251-252).

We review the District Court's interpretation of the insurance policies *de novo*. N. Ins. Co. of New York v. Aardvark Assoc., Inc., 942 F.2d 189, 191 n.2 (3d Cir. 1991). Our review of questions of law is also *de novo*. N. Penn Gas Co. v. Corning Natural Gas Corp., 897 F.2d 687, 688 (3d Cir. 1990). Finally, it is undisputed that New Jersey law applies to this case. See Mar. 3, 2004 D. Ct. Op., app. at 320a. The National Fire policy was made in New Jersey, and the covered property is located in Sea Isle City, New Jersey.

13

contractual in nature, they are not ordinary agreements; they are 'contracts of adhesion' and, as such, are subject to special rules of interpretation." County of Hudson v. Selective Ins. Co., 752 A.2d 849, 852 (N.J. Super. Ct. App. Div. 2000). Consequently, "insurance contracts should be construed liberally in [the insured's] favor to the end that coverage is afforded to the full extent that any fair interpretation will allow. . . . Further, when a policy contains an ambiguity, i.e., the phrasing chosen by the insurer does not permit the average insured to 'make out the boundaries of coverage,' the ambiguity must be construed in favor of the insured." Harrah's Atlantic City, Inc. v. Harleysville Ins. Co., 671 A.2d 1122, 1125 (N.J. Super. Ct. App. Div. 1996) (citations and quotations omitted); County of Hudson, 752 A.2d at 852 ("[W]here the language of a policy will support two meanings, one favorable to the insured and the other favorable to the insurer, the interpretation sustaining coverage should be applied."). Relevant to our present analysis, "where the policy provision under examination relates to the inclusion of persons other than the named insured within the protection afforded, a broad and liberal view is taken of the coverage extended. But, if the clause in question is one of exclusion or exception, designed to limit the protection, a strict interpretation is applied." Erdo v. Torcon Const. Co., Inc., 645 A.2d 806, 808 (N.J. Super. Ct. App. Div. 1994) (citation omitted; emphasis removed).

In determining whether an insurance company has a duty to defend under the terms of its policy, we are not limited to the facts and allegations contained within the four corners of the underlying complaint; rather, "facts outside the complaint may trigger the duty to defend." SL Indus., Inc. v. Am. Motorists

14

Ins. Co., 607 A.2d 1266, 1272 (N.J. 1992). "Insureds expect their coverage and defense benefits to be determined by the nature of the claim against them, not by the fortuity of how the plaintiff, a third party, chooses to phrase the complaint against the insured." Id. Accordingly, it is proper to consider evidence not set forth in the underlying litigation in determining whether National Fire owed any duties to the Alexanders in that litigation.

B.

National Fire contends that the District Court erred in holding that the portion of the support system of the deck that failed was a common element and therefore subject to the coverage provided by National Fire. It points to the uncontested fact that the cause of the collapse was the failure of the nails connecting the deck joists to the first box joist. From this it argues that "because each of these elements solely supported the Alexanders' deck – and had no connection with the other deck nor role in supporting the other deck – the nails, deck joist and box joist were limited common elements." It supports this contention with a detailed analysis of Dennis Funk's conclusions surrounding the construction and collapse of the deck. National Fire then goes on to argue that although its policy obligates it to cover the unit owners for the ownership, maintenance and repairs of the Condominium Association's common elements, it is not obligated to cover "limited common elements," which it defines as those elements "exclusively

15

reserved for [a] unit owner's exclusive use or occupancy."[5] National Fire Br. at 22 (citing National Fire policy, app. at 257a). It then asks us to conclude from these polysyllogisms that the support structure *directly* supporting the Alexanders' wooden deck was not a common element, and that all liability for the injuries sustained from the deck's collapse must be

---

[5] New Jersey law defines common elements as:

(i)     the land described in the master deed;

(ii)    *as to any improvement*, the foundations, *structural and bearing parts, supports*, main walls, roofs, basements, halls, corridors, lobbies, stairways, elevators, entrances, exits and other means of access, *excluding any specifically reserved or limited to a particular unit or group of units*;

* * *

(viii)  such other elements and facilities as are designated in the master deed as common elements.

N.J. Stat. Ann. § 46:8B-3(d) (2006) (emphasis added). Conversely, limited common elements are "those common elements which are for the use of one or more specified units to the exclusion of other units." N.J. Stat. Ann. § 46:8B-3(k) (2006). This distinction coincides with the exclusions in the endorsement to the National Fire policy that adds the Alexanders as additional insureds. See National Fire policy, app. at 107a (stating that coverage is excluded for those common elements "reserved for [a] unit owner's exclusive use or occupancy").

16

pinned on the Alexanders' insurance carriers, Shelby and USF&G.

## C.

We decline National Fire's invitation to engage in a detailed factual analysis of which part of the support structure failed and whether that portion exclusively supported the Alexanders' deck.[6] Rather, by examining the nature of the right of use granted in the Master Deed—an easement—we conclude that the *surface* of the Alexanders' deck was a limited common

---

[6] National Fire argues that the District Court erred in treating as uncontested the Alexanders' allegation in their motion for summary judgment that "the structural support system of the deck, which included the deck joists, constituted a shared common element in that it supported both the Plaintiffs' deck and the deck directly beneath it." May 5, 2004 D. Ct. Op., app. at 343a (analyzing paragraph 67 of the Alexanders' motion for summary judgment). The record on this issue is convoluted; it is unclear what exactly the parties argued below and which specific facts the District Court believed that National Fire had conceded. Nevertheless, because we do not need to rely on the District Court's apparent conclusion that National Fire waived various arguments to affirm the District Court's ultimate decision—and the District Court itself offered independent reasons for its decision—we do not reach this question. See Morse v. Lower Merion School Dist., 132 F.3d 902, 904 n.1 (3d Cir. 1997) (citations omitted) ("We may affirm the lower court's ruling on different grounds, provided the issue which forms the basis of our decision was before the lower court.").

17

element, i.e., a common element reserved for the Alexanders' exclusive use, whereas the entire deck *support structure* was a common element.

## IV.

## A.

In reaching this conclusion, we note that in the cumulative experience of the judiciary, the present scenario is rather novel. The case that most resembles the facts here in applying the distinction between common and limited common elements is Society Hill Condominium Association v. Society Hill Associates, 789 A.2d 138 (N. J. Super. Ct. App. Div. 2002). In analyzing how much of a condominium unit is a common element by using the Condominium Act and the parties' master deed, the Society Hill court applied a bright-line distinction and determined that those elements "inside" the owners' units are not common elements (i.e., materials extending to the drywall); whereas those "outside" the units are common elements (i.e., elements in the structure beyond the drywall). Id. at 143-145.[7]

Another case that addresses the distinction between common and limited common elements is Ellenheath Condominium Association, Inc. v. Pearlman, 683 A.2d 582 (N.J. Super. Ct. App. Div. 1996), in which an individual unit owner's underground fuel oil storage tank had begun leaking and had to

---

[7] The District Court in this case did not believe that the teachings of Society Hill were applicable because of this inside/outside distinction. See Mar. 3, 2004 D. Ct. Op., app. at 332a.

18

be replaced. The unit owner sued the condominium association for the cost of the replacement. Using the definition of "common element" found at N.J. Stat. Ann. § 46:8B-3(d)(ii), the court determined that because each storage tank was specifically reserved for the use of a particular unit, the tanks were not common elements. Id. at 583.

We agree with the District Court that Ellenheath is distinguishable. See Mar. 3, 2004, D. Ct. Op., app. at 332a. Although the Alexanders' deck was reserved for their exclusive use, which prevents at least a portion of it from being a common element, unlike the storage tank in Ellenheath, the Alexanders' deck also had a support structure that benefitted more than one unit owner, making elements of that structure pure common elements.

B.

Recognizing that the unique nature of the facts and the law in Society Hill prevents us from using inductive reasoning by analogy to apply its exact holding to the case at hand, we turn our analysis to the language of the Alexanders' Master Deed. The Deed specifically refers to balconies and patios as "Common Elements subject to Exclusive Easements." Master Deed, app. at 134a. It then proceeds to state that:

> Any balcony or patio to which there is a direct
> access from the interior of a unit shall constitute
> a common element subject to exclusive easement
> for the exclusive use of the owner of such unit.
> The unit owner shall be responsible for the
> removal of snow from any such balcony or patio

19

and for the maintenance and repair of the same which shall not be a common expense.

Id. The District Court interpreted the Deed as distinguishing between two elements of the deck's structure: the surface and the structure supporting the deck—with the former constituting a limited common element and the latter a common element. Mar. 3, 2004 D. Ct. Op., app. at 329a-330a.

We agree with this distinction, and reach this conclusion based on an examination of the easement granted to the Alexanders in the Master Deed. "An easement is a nonpossessory incorporeal interest in another's possessory estate in land, entitling the holder of the easement to make some use of the other's property." Borough of Princeton v. Bd. of Chosen Freeholders, 755 A.2d 637, 644 (N.J. Super. Ct. App. Div. 2000) (citation and quotations omitted). "The extent of the easement created by a conveyance is fixed by the conveyance." Eggleston v. Fox, 232 A.2d 670, 672 (N.J. Super. Ct. App. Div. 1967) (quoting Restatement of Property § 482 (1944)). The scope of the easement "should be interpreted to give effect to the intention of the parties ascertained from the language used in the instrument . . . and to carry out the purpose for which it was created." Restatement (Third) of Property § 4.1 (2000); Borough of Princeton, 755 A.2d at 644 ("The polestar of contract construction is to discover the intention of the parties as revealed by the language used by them."). Moreover, "when there is any ambiguity or uncertainty about an easement grant, the surrounding circumstances, including the physical conditions and character of the servient tenement, and the requirements of the grantee, play a significant role in the determination of the

20

controlling intent." Hyland v. Fonda, 129 A.2d 899, 904 (N.J. Super. Ct. App. Div. 1957). The extent of the dominant tenement's duty to repair the property subject to the easement is also determined by the conveyance. Restatement of Property § 485.

Considering the Master Deed as a whole, we see no indication that the easement extends beyond the use of the surface of the deck. First, the easement is solely for the use of the patio or balcony; it makes no mention of the rights or duties surrounding the support structure. Second, the clause following the grant of the easement qualifies the scope of the easement. That provision, which speaks about the repair and maintenance of the patio or balcony, addresses the Alexanders' duty to remove snow from the patio or balcony, indicating that the focus of the grant is on the deck's surface. Third, such a bright-line distinction is not foreign to the Master Deed, because the "Maintenance and Repair" clause of Subsection N defines the parties' rights as beginning and ending at the inside of the walls and windows. See Master Deed, app. at 138a (emphasis added) (stating that "Individual Condominium Unit Owners shall be responsible at their own expense for the maintenance, repair and replacement of . . . the *inside* of all walls forming or dividing each Condominium Unit [and the] *interior* side of windows, etc., within each unit"). Fourth, in 1997, when one of the 4x4 vertical posts supporting the deck was replaced, the unit owners shared the cost of the replacement as a common expense. There is therefore a history in the Condominium Association of regarding the support structure as a common element, the maintenance of which is a common expense. Cf. Cumberland County Improvement Auth. v. GSP Recycling Co., Inc., 818

21

A.2d 431, 438 (N.J. Super. Ct. App. Div. 2003) ("[T]he terms of the parties' written agreement may be explained or supplemented by evidence of their course of dealing.").

Finally, as a practical matter, it makes no sense for the parties to have divided the support structure into various subparts, some of which are common and some of which are not. If we were to adopt National Fire's view, the Alexanders would be responsible for the maintenance and repair of the deck joists and first box joists, and the Association would be liable for the rest of the support structure. Both parties would have to inspect and maintain the underside of the deck, and liability for repairs would turn on the appraisal of what elements support which structure. Based on the Master Deed, the National Fire Policy and the New Jersey Condominium Act, it makes far greater sense—and comports with what we believe to be the parties' intent—to classify the entire support structure as a common element.

This bright-line distinction between common and limited common elements comports with the New Jersey statutory definition of what constitutes a common element and what is a limited common element, see N.J. Stat. Ann. § 46:8B-3(d)(ii) (stating that common elements include the supports, structural and bearing parts of an improvement, unless those structural elements were "specifically reserved" to a particular unit); N.J. Stat. Ann. § 46:8B-3(k) (defining limited common element), and reaches a result similar to the inside/outside distinction of Society Hill. Consequently, for these reasons we conclude that the support structure, which includes the deck joists, is a common element. The surface is a limited common element.

22

See Polselli v. Nationwide Mut. Fire Ins. Co., 126 F.3d 524, 528 n.3 (3d Cir. 1997) ("In the absence of any precedent of the [state] Supreme Court, we must predict how that court would decide this issue.").

Having concluded that the support structure is a common element, it necessarily follows that National Fire's policy covers the Alexanders for this incident. Endorsement CG20041185 of the National Fire policy provides that the Alexanders, as additional insureds, are covered "with respect to liability arising out of the ownership, maintenance or repair" of the "portion of the premises" not reserved for their exclusive use. National Fire policy, app. at 107a. Because our conclusion that the deck's support structure is a common element necessarily means that it was *not* a "portion of the premises" reserved for the Alexanders' exclusive use, and because the support structure was the cause of the deck's collapse, National Fire is obligated to insure the Alexanders for liability arising out of the collapse. See National Fire policy, app. at 95a (stating that National Fire will defend against and "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies").

V.

Our next task is to determine whether National Fire is liable as a primary or excess insurer. In his January 19, 2005 opinion, Judge Sanchez held that National Fire was liable as a primary insurer, and that third-party defendants Shelby and USF&G were excess insurers. National Fire now challenges that ruling on two bases, arguing that (1) Judge Sanchez was

23

collaterally estopped by Judge Baylson's prior comments on the issue, and (2) Judge Sanchez erred in holding that National Fire was a primary, and not excess, insurer. We reject National Fire's challenges and will affirm Judge Sanchez's grant of summary judgment to Shelby and USF&G.

A.

"Collateral estoppel, also known as issue preclusion, prevents relitigation of a particular fact or legal issue that was litigated in an earlier action." Seborowski v. Pittsburgh Press Co., 188 F.3d 163, 169 (3d Cir. 1999) (citing Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 326 (1979)). In his March 3, 2004 opinion, Judge Baylson expressed a preliminary opinion on the nature and scope of coverage provided by National Fire under the policy, stating:

> The Court is of the opinion that the insurance policy issued to the condominium association by defendant constitutes an "excess insurance" policy. That is, Defendant must pay only those insurance proceeds in excess of what is paid under the terms of any other insurance policy held by the plaintiffs. However, the Court also believes that Plaintiffs' own insurance policy, issued directly to Plaintiffs by the Shelby Insurance Company ("Shelby"), also constitutes an "excess insurance" policy. As such, New Jersey law would deem both insurance policies to be primary and would require each insurer to share the costs associated with defending

24

Plaintiffs in the negligence claim pending against them. <u>Universal Underwriters Ins. Co. v. CNA Ins. Co.</u>, 706 A.2d 217, 219 (N.J. Super. Ct. App. Div. 1998) (quoting <u>Cosmopolitan Mut. Ins. Co.</u>, 147 A.2d at 534); <u>Harrison v. Ford Motor Credit Co.</u>, 655 A.2d 931 (N.J. Super. Ct. App. Div. 1998) (quoting <u>Cosmopolitan Mut. Ins. Co. v. Continental Cas. Co.</u>, 147 A.2d 529 (N.J. 1959)).

*However, the Court declines to make a final holding on this point.* Although Defendant did raise the issue of "other insurance," as an alternative defense, the Court does not believe that it can properly define the scope of Defendant and Shelby's insurance obligation in the absence of Shelby. In this respect, the Court finds Shelby to constitute an indispensable party.

Mar. 3, 2004 D. Ct. Op., app. at 333a-334a (emphasis added).

Then, in his May 5, 2004 opinion, Judge Baylson again addressed the nature of his prior treatment of the excess/primary coverage issue: "the Court expressly declined to rule on the issue of excess insurance absent the presence of Shelby, which the Court deemed to be a necessary party . . .." May 5, 2004 D. Ct. Op., app. at 345a. Judge Baylson also characterized his statement on excess coverage in his prior opinion as being merely a "preliminary opinion." <u>Id.</u> Addressing yet again the nature of the May 5, 2004 discourse, Judge Sanchez, in *his* final disposition of the matter, observed that

25

> National Fire misconstrues Judge Baylson's decision when it argues collateral estoppel bars finding it is the primary insurer. Judge Baylson found National Fire was obligated to cover the Alexanders and *specifically reserved the question of whether it was a priamry* [sic] *or excess carrier*.

Jan. 19, 2005 D. Ct. Op., app. at 372a n.1 (emphasis added). Judge Sanchez later held that National Fire was the primary insurer, and that USF&G and Shelby were excess.

We agree with Judge Sanchez. Judge Baylson expressly declined to issue a definitive ruling on the matter of primary/excess coverage. Accordingly, there was no final, definitive ruling on the subject that could have barred later relitigation. Houbigant, Inc. v. Fed. Ins. Co., 374 F.3d 192, 204 (3d Cir. 2004) (citation omitted) (stating that for collateral estoppel to apply "a final judgment on the merits [must have been] issued in the prior proceeding").[8]

---

[8] We also seriously doubt whether there was privity between the Alexanders and Shelby on the matter of excess coverage. "Privity generally involves a party to earlier litigation so identified in interest with a party to later litigation that they represent the same legal right." E.I.B. by I.J. v. J.R.B., 611 A.2d 662, 663 (N.J. Super. Ct. App. Div. 1992). In the earlier litigation to which Shelby was not a party, the Alexanders would have been interested in maximizing their coverage, irrespective of the primacy of the insurer, whereas Shelby would have been seeking to minimize its exposure. We need not reach this

26

B.

National Fire next contends that Judge Sanchez erred in holding that National Fire was the primary insurer of the damaged property.  National Fire argues that, under its policy, it is not a primary insurer of this property, but rather an excess insurer.  Because the policies issued by USF&G and Shelby to the Alexanders state that their coverage shall be excess over "other valid and collectible insurance except insurance written specifically to cover as excess over . . . this policy," see Shelby policy, app. at 231a, ¶ 8; USF&G policy, app. at 193a, ¶ 8, National Fire then argues that because its policy is also excess, the burden of coverage should therefore be shared between all three companies as co-primaries.  See National Fire Br. at 45 (citing Harrison, 655 A.2d at 933 (stating that when no single policy "can operate as a policy of 'excess' insurance . . . [t]he excess insurance provisions are [thus] mutually repugnant [and so] the general coverage of each policy applies and each company is obligated to share in the cost of the settlement and expenses").

We reject National Fire's arguments.  The policy issued by National Fire provides that it is primary coverage, and only qualifies itself as excess coverage in a few instances, none of which are triggered in the present case.  In defining the nature of its coverage, the National Fire policy states:

question, however, because clearly there was no prior ruling barring later relitigation.

27

**4.      Other Insurance**

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages **A** or **B** of this Coverage Part, our obligations are limited as follows:

**a.      Primary Insurance**
This insurance is primary except when **b.** below applies. . . .

**b.      Excess Insurance**
This insurance is excess over:

* * *
**(2)**    Any other primary insurance available to *you* covering liability for damages arising out of the premises or operations for which *you* have been added as an additional insured by attachment of an endorsement.

National Fire policy, app. at 102a-103a (emphasis added). The term "you" in section 4(b)(2) is defined in the policy as referring to the "Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this

28

policy."[9]  Id. at 95a.  The policy then goes on to define the singular term "insured" as "any person or organization qualifying as such under Section II - Who Is An Insured."  Id.

It cannot be seriously doubted that the Condominium Association is the Named Insured and the Alexanders are additional insureds.  Although the term "Named Insured" is not defined in the policy, the declarations page for the National Fire policy lists the Condominium Association as Named Insured.  Id. at 40a.  That someone may be an additional insured does not mean that they are a Named Insured—the two terms are not interchangeable.  Simply put, Named Insured means Named Insured.  See Botti v. CNA Ins. Co., 824 A.2d 1120, 1125 (N.J. Super. Ct. App. Div. 2003) (citations omitted) ("[T]he term

_____

[9] National Fire argues that Judge Sanchez's analysis of the meaning of section 4(b)(2) was fatally flawed because he mistakenly cited the definitions for "you" and "your" from the USF&G policy and not the National Fire policy.  We disagree.  Although Judge Sanchez may have cited the wrong insurance policy for the definitions of "you" and "your," this did not affect his ultimate legal conclusion.  The definitions of "you" and "your" provided in the USF&G and Shelby insurance policies are substantially similar to the National Fire policy.  Compare Shelby policy, app. at 215a, and USF&G policy, app. at 180a, with National Fire policy, app. at 95a.  All three clearly state that "you" and "your" refer to the Named Insured shown in the declarations.  National Fire's policy merely adds that "you" and "your" additionally encompasses anyone else who qualifies as a Named Insured under this policy.  National Fire does not argue that the Alexanders qualify as a Named Insured.

29

"named insured" is self-defining . . . [and] refers only to the names so appearing in the declaration"); Black's Law Dictionary ("Named Insured. In insurance, the person specifically designated in the policy as the one protected and, commonly, it is the person with whom the contract of insurance has been made.").

Having then determined that the Condominium Association is the Named Insured, it is clear that National Fire is the primary insurer for this incident. Substituting the Condominium Association, who is the Named Insured, for the words "you" in section 4(b)(2) produces the following result: "This insurance is excess over . . . any other primary insurance available to [the Condominium Association] covering liability for damages arising out of the premises or operations for which [the Condominium Association has] been added as an additional insured by attachment of an endorsement." Consequently, the National Fire policy will only be deemed excess in the current circumstances if there is other primary insurance available to the *Condominium Association* or if the *Association* has been added as an additional insured by endorsement to another policy.

The only other insurance policies that could possibly provide this protection for the Condominium Association are those issued by USF&G and Shelby. Those policies, however, only name the Alexanders as Named Insured. USF&G policy, app. at 175a; Shelby policy, app. at 211a. The Condominium Association is not named, by endorsement or otherwise, on either policy as an insured. Accordingly, per the operation of section 4(b)(2) of the National Fire policy, National Fire's coverage is primary.

30

Bringing this analysis to a close, the final matter that must be dealt with is whether the USF&G and Shelby policies also provide primary coverage for this incident. As already noted, however, the Shelby and USF&G polices provide that their coverage shall be excess over "other valid and collectible insurance except insurance written specifically to cover as excess over" these policies. Shelby policy, app. at 231a, ¶ 8; USF&G policy, app. at 193a, ¶ 8. The Alexanders, as the holders of the Shelby and USF&G policies, possess "other valid and collectible insurance" from National Fire. See supra section IV. Accordingly, because the National Fire policy was not specifically written to be excess to the Shelby or USF&G policies, per the operation of the three policies' "other insurance" provisions, National Fire is the sole primary insurer of the Alexanders for the liability arising out of the collapse of the deck and USF&G and Shelby are excess.

\* \* \* \* \* \* \* \*

We will affirm the judgments of the District Court. The National Fire policy covers the Alexanders as additional insureds. Consequently, because the deck's support structure is a common element of the Condominium Association, National Fire is required to cover the Alexanders for the failure of that structure. Moreover, the coverage provided by National Fire is primary, and that of Shelby and USF&G are excess.

_____

31